**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

United States Court of Appeals
Fifth Circuit

**F I L E D**
January 3, 2013

Lyle W. Cayce
Clerk

No. 11-40783

UNITED STATES OF AMERICA

Plaintiff - Appellee

v.

GABRIEL ANDRES

Defendant - Appellant

Appeal from the United States District Court for the
Southern District of Texas

Before BARKSDALE, DENNIS, and GRAVES, Circuit Judges.

JAMES E. GRAVES, JR., Circuit Judge:

Defendant - Appellant Gabriel Andres ("Andres") appeals his conviction and sentence for conspiracy to possess with intent to distribute more than five kilograms of cocaine. Andres contends that the district court erred in denying his motion to suppress evidence and in applying a two-point sentencing enhancement for use of a minor to commit his crime. For the following reasons, we AFFIRM the judgment of the district court.

## BACKGROUND

The factual background is based on testimony presented at the suppression hearing before the district court. In 2009, U.S. Immigration and Customs Enforcement, in conjunction with the Drug Enforcement

No. 11-40783

Administration, was conducting an investigation into the drug trafficking activities of Albert Figueroa Nava ("Figueroa") in Laredo, Texas, and elsewhere. Agents[1] utilized physical surveillance as well as Title III wiretaps, and had already seized several hundred kilograms of cocaine and several million dollars of drug proceeds by December 2009. Based on their surveillance, agents believed that on December 11, 2009, Figueroa and Christino Dominguez ("Dominguez") loaded approximately twenty kilograms of cocaine into a secret compartment in a red pickup truck and parked the truck on a public street in front of a Holiday Inn in Laredo, with a car carrier trailer attached to it. Agents installed a GPS device on the underside of the truck while it was parked. On December 12, 2009, agents observed Dominguez meeting with Andres near the truck, and Andres subsequently driving the truck away. For various reasons, agents believed the truck would be driven to Chicago. The agents preferred to let the truck leave Laredo without seizing it to avoid jeopardizing the ongoing investigation and to discover who would be receiving it.

The agents ceased physical surveillance of the truck around 10:00 p.m. on December 12, 2009. However, around 4:00 a.m. on December 13, 2009, the GPS system notified agents that the truck had begun to move. Agents contacted the nearby border patrol checkpoint to request that the truck not be searched, and continued to monitor the truck's location by GPS. When it became clear that the truck was heading for Chicago on I-55, agents contacted the Illinois State Police. The agents preferred that the drugs in the truck be discovered in a traffic stop, which would make it unnecessary to reveal the existence of the federal investigation. Agents informed Illinois State Police Sergeant Jamal Simington ("Simington") that a credible confidential informant ("CI") would soon be

---

[1] Because the identity of specific federal agents is not relevant to the analysis, all federal agents involved in the Figueroa investigation and the present case are simply referred to as "agents."

contacting him with information about a vehicle traveling to Chicago, but did not say anything about the Laredo investigation. The CI, assisted by agents, placed a call to Simington and described the truck, explaining that it contained narcotics and was heading for Chicago. The CI called Simington several more times to provide updated information on the truck's location, as revealed by the GPS surveillance.

On the morning of December 14, 2009, as the truck approached Chicago from the south, Simington and several members of his team, including Sergeant Chad Brody ("Brody"), were staged at various points along I-55. Simington was positioned at the southernmost point, at mile marker 241 near Bloomington, in an unmarked car. Brody was positioned at mile marker 263 in a marked car with a drug-sniffing dog. Around 5:45 a.m., Simington observed the truck pass him on I-55 and began to follow it. Simington observed that the trailer attached to the truck was bouncing or swerving within its lane in a potentially dangerous manner, and that the trailer's taillights were not operating consistently. Simington also informed the other members of his team that he had observed the truck. The truck passed Brody around 6:19 a.m. and Brody began to follow it. Brody observed that the trailer's taillights were "flicker[ing] as if there was a mechanical issue" and that the trailer was swaying back and forth within its lane. Brody initiated a traffic stop based on improper lane usage and improper lighting. The truck initially stopped on a narrow shoulder, so Brody directed the truck to pull over to a ramp to get away from the interstate traffic.[2]

Brody approached Andres, who was driving the truck, and requested his driver's license, registration, and insurance. Brody returned to his car and ran

---

[2] Brody testified that the video camera in his patrol car automatically starts recording when the emergency lights are activated. However, the video submitted into evidence does not begin until the truck is already stopped on the side of the freeway. Brody testified that he was informed after the fact that "the system performed some kind of soft reboot to where it didn't initially start recording right away."

a check on Andres' license. Brody determined that Andres had a valid license, a clean driving record, and no outstanding warrants, and decided to issue a written warning for the traffic offenses. Brody wrote a warning ticket and returned to the truck to speak with Andres. Brody asked Andres to get out of the truck so that he could talk to Andres about the taillight problem. Andres inspected the electrical connection between the truck and the trailer. Brody told Andres that he would give him a warning ticket and handed him a clipboard to sign the ticket.

While Andres was signing the ticket, Brody asked him where he was coming from. Andres replied that he was coming from Joliet, where he had dropped off a car. However, Brody knew that Simington had spotted the truck south of Joliet, and that Andres would not have had time to stop in Joliet. Brody also observed at this point that Andres began to fidget and move his feet and arms around, which Brody interpreted as nervousness. Brody asked Andres who was in the truck with him. Andres responded that it was his stepdaughter, but he did not know her last name. Brody then patted down Andres, checked inside his jacket for weapons, and went to talk to the passenger, Noemi Gutierrez ("Gutierrez"). She stated that she and Andres had come from Joliet, where they had dropped off a van on Ruby Street.

Brody returned to speak to Andres and asked him if he had any drugs in the truck. Andres denied that he did, and said "go ahead and check." Brody asked permission to search for drugs with his dog, and Andres consented. The dog alerted to the presence of drugs within about thirty seconds. Officers ultimately found over twenty kilograms of cocaine in a hidden compartment in the truck.

Before the district court, Andres moved to suppress the drug evidence, arguing that Brody did not initially have probable cause to stop the truck and that the duration and scope of the stop were not justified by the alleged traffic

offenses. The district court denied this motion in an oral ruling following the suppression hearing. Andres then waived his right to jury trial and consented to a bench trial based on stipulated facts in order to preserve his right to appeal the suppression issue. The district court found Andres guilty of conspiracy to possess with intent to distribute more than five kilograms of cocaine, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A) and 846.

The presentence report recommended a two-level sentencing enhancement pursuant to U.S.S.G. § 3B1.4, "Using a Minor to Commit a Crime," because Andres and Gutierrez had brought Gutierrez's four-year-old daughter on the drive to Chicago "to make the appearance of a family who was traveling and thus to avoid the detection of the narcotics that were being concealed in the vehicle." Andres filed an objection to this enhancement. The district court overruled the objection, finding that Andres and Gutierrez brought along Gutierrez's daughter to "giv[e] the impression that this was a family outing." The district court sentenced Andres to 135 months of imprisonment followed by five years of supervised release. Andres filed a timely notice of appeal.

## DISCUSSION

### I.    Motion to Suppress

Andres argues that the drug evidence should be suppressed because it was obtained through an unreasonable search that violated the Fourth Amendment. He argues that the initial traffic stop by Brody was not justified because it was "based on pretext rather than any actual offense." He further argues that even if the stop was initially justified, Brody's continued questioning and dog search were not reasonably related to the circumstances warranting the stop. Finally, he argues that the warrantless use of a GPS device to track his movements for several days constitutes an unreasonable search or seizure.

"In reviewing a district court's denial of a motion to suppress, we review the district court's findings of fact for clear error and its conclusions of law de

novo." *United States v. Lopez-Moreno*, 420 F.3d 420, 429 (5th Cir. 2005) (citation omitted). "In reviewing findings of fact, we view the evidence in the light most favorable to the party prevailing below, which in this case is the Government." *Id.* (citation omitted).

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. CONST. amend. IV. This protection extends to vehicle stops and temporary detainment of a vehicle's occupants. *United States v. Shabazz*, 993 F.2d 431, 434 (5th Cir. 1993). We analyze the constitutionality of a traffic stop using the two-step inquiry set forth in *Terry v. Ohio*, 392 U.S. 1 (1968). *United States v. Macias*, 658 F.3d 509, 517 (5th Cir. 2011). First we determine whether the stop was justified at its inception. *Id.* If the initial stop was justified, we determine "whether the officer's subsequent actions were reasonably related in scope to the circumstances that justified the stop of the vehicle in the first place." *Id.*

## A.    Validity of Initial Stop

"For a traffic stop to be justified at its inception, an officer must have an objectively reasonable suspicion that some sort of illegal activity, such as a traffic violation, occurred, or is about to occur, before stopping the vehicle." *Lopez-Moreno*, 420 F.3d at 430. Brody testified that he stopped Andres because the taillights on the truck's trailer were flickering and because the truck and trailer were swaying back and forth within the lane. Andres does not contend that improper lighting and improper lane usage are not in fact traffic violations; rather, he argues that, contrary to Brody's testimony, he did not commit these violations. Andres points out that the video evidence, which begins when Andres is already pulled over and shows him driving slowly from the shoulder of the freeway onto a ramp, reveals no lighting problems or swerving. However, this does not establish that the swerving and lighting problems were not present

6

prior to the stop, when Andres was traveling at highway speed. The district court credited Brody's testimony concerning the traffic violations, and the video and other evidence does not show that this factual finding was clearly erroneous. Accordingly, the stop was justified at its inception based on observed traffic violations.

### B.     Duration and Scope of Stop

A traffic stop "must be temporary and last no longer than is necessary to effectuate the purpose of the stop, unless further reasonable suspicion, supported by articulable facts, emerges." *United States v. Brigham*, 382 F.3d 500, 507 (5th Cir. 2004) (en banc). "If the officer develops reasonable suspicion of additional criminal activity during his investigation of the circumstances that originally caused the stop, he may further detain [the] occupants [of the vehicle] for a reasonable time while appropriately attempting to dispel this reasonable suspicion." *United States v. Pack*, 612 F.3d 341, 350 (5th Cir. 2010).

Andres argues that his "detention impermissibly exceeded its original scope when Sergeant Brody detained him longer than necessary to issue a written warning and then questioned him about matters wholly unrelated to the purpose of a routine traffic stop." This court has emphasized that police questioning, even about matters unrelated to a traffic stop, does not violate the Fourth Amendment absent some nonconsensual restraint on one's liberty. *Brigham*, 382 F.3d at 508. Accordingly, the question is only whether Andres was detained for longer than necessary to deal with the initial traffic violations, and if so, whether additional reasonable suspicion of wrongdoing developed during the time that Brody was legitimately addressing the traffic violations. The government understandably does not contend that the entire stop, including the continued interrogation of Andres and his passenger and the dog search, was justified by the initial traffic violations. Rather, the government argues that Andres' untruthful answers and nervousness, the anonymous tip stating that the

truck was carrying drugs, and other factors created additional reasonable suspicion justifying the continued detention.

Andres contends that after Brody checked his driving and criminal records and wrote a warning ticket, Brody should have immediately obtained his signature on the ticket and let him go. Instead, Brody asked Andres to walk to the back of the trailer to look at the lights that were previously flickering and the wiring that might have been loose. After briefly discussing the lights and wiring, Brody handed Andres the warning ticket to sign and immediately asked him where he was coming from. Andres responded that he had come from Joliet. However, Brody knew that Simington had spotted Andres coming from south of Joliet, and that given the amount of time that had passed since Simington spotted Andres, Andres would not have had time to make a stop in Joliet. The government argues that this initial question, which revealed to Brody that Andres was lying and thereby created further suspicion, took place while Andres was signing the warning ticket and did not extend the duration of the stop. The district court found that the initial question and answer occurred "as the legitimate stop [was] still in progress," and that Andres' further responses and nervousness created additional suspicion. The district court concluded that these facts provided Brody with a legitimate basis to continue the stop.

We do not find it unreasonable that an officer who has stopped a driver based on code violations and safety concerns involving a trailer would ask the driver to exit the vehicle to look at the trailer and discuss the problems. Furthermore, we agree that Brody's question asking where Andres was driving from occurred before Brody had finished dealing with the traffic offenses and did not extend the scope or duration of the stop. Andres' untruthful answer created further suspicion justifying continued detention, and his subsequent answers created even further suspicion. Based on this reasonable suspicion, Brody continued to investigate, ultimately requesting and receiving permission to

No. 11-40783

search the truck.  Because Brody's continued search and seizure beyond the scope of the initial traffic stop were justified by additional reasonable suspicion, the district court did not err in concluding that the scope of the stop was reasonable.

### C.    GPS Monitoring

In *United States v. Jones*, 132 S. Ct. 945, 949 (2012), the Supreme Court held that "the Government's installation of a GPS device on a target's vehicle, and its use of that device to monitor the vehicle's movements, constitutes a 'search.'"  Although *Jones* did not reach the issue of whether warrantless GPS searches are unreasonable, "[w]arrantless searches are per se unreasonable under the Fourth Amendment, subject to a few specific exceptions." *United States v. Mata*, 517 F.3d 279, 284 (5th Cir. 2008) (citing *Coolidge v. New Hampshire*, 403 U.S. 443, 474-75 (1971)).  Andres argues that the warrantless placement and use of the GPS device to monitor the truck he was driving violated the Fourth Amendment. Andres further argues that because this illegal GPS search directly led to the discovery of the drugs in his truck, the drugs must be suppressed under the "fruit of the poisonous tree" doctrine. *See, e.g.*, *United States v. Hernandez*, 670 F.3d 616, 620 (5th Cir. 2012).

Because Andres did not argue before the district court that the GPS search was unconstitutional, we review his argument only for plain error. *See United States v. Baker*, 538 F.3d 324, 328-29 (5th Cir. 2008).  To demonstrate plain error, an appellant must show an error that is clear or obvious and that affected his substantial rights. *Puckett v. United States*, 556 U.S. 129, 135 (2009).  If the appellant makes such a showing, this court has the discretion to remedy the error, but should do so only if the error seriously affects the fairness, integrity, or public reputation of judicial proceedings. *Id.*  "[W]here the law is unsettled at the time of trial but settled by the time of appeal, the 'plainness' of the error

should be judged by the law at the time of appeal." *United States v. Escalante-Reyes*, 689 F.3d 415, 423 (5th Cir. 2012) (en banc).

We need not decide whether warrantless GPS searches are per se unreasonable. Furthermore, we need not decide whether the agents in this case acted without a warrant or whether the drug evidence is derived from the GPS search. Even assuming that a Fourth Amendment violation occurred and that suppression would otherwise be appropriate, the evidence should not be suppressed in this case because the officers acted in reasonable reliance on circuit precedent.

"[S]earches conducted in objectively reasonable reliance on binding appellate precedent are not subject to the exclusionary rule." *Davis v. United States*, 131 S. Ct. 2419, 2423-24 (2011). In December 2009, it was objectively reasonable for agents operating within the Fifth Circuit to believe that warrantless GPS tracking was permissible under circuit precedent. In *United States v. Michael*, 645 F.2d 252, 257 (5th Cir. 1981) (en banc), this court held that "reasonable suspicion is adequate to support warrantless beeper installation" on a suspect's vehicle parked in a public place. Although the precise technological capabilities of the beeper were not explained in the opinion, the court described it as an "electronic tracking device." *Id.* at 254. The dissent was concerned that the beeper would "enable[] [police] to maintain continuous electronic surveillance over [a person's] movements twenty-four hours per day continuously and indefinitely." *Id.* at 260 (Tate, J., dissenting). Despite any possible technological differences between a 1981 "beeper" and the GPS device used in this case, the functionality is sufficiently similar that the agents' reliance on *Michael* to install a GPS device on the truck, in light of the reasonable suspicion of drug trafficking, was objectively reasonable. Because we find that the district court did not err in refusing to suppress the drug evidence, we do not reach the remaining plain error factors.

## II.     Sentence Enhancement

"We review the district court's factual findings for clear error and its interpretation and application of the Guidelines de novo." *United States v. Molina*, 469 F.3d 408, 413 (5th Cir. 2006) (quotation and citation omitted). The district court concluded that the § 3B1.4 enhancement was justified because Andres and Gutierrez brought Gutierrez's daughter on the drive to avoid suspicion by appearing to be on a "family outing." Andres does not appear to challenge any factual finding by the district court; rather, he argues that because Gutierrez's daughter was "already in the vehicle" when he received it, he did not take any affirmative action to involve her in the offense. As Andres notes, the mere presence of a minor at the scene of a crime is insufficient to support an enhancement based on § 3B1.4; a defendant must "take some affirmative action to involve the minor in the offense." *United States v. Mata*, 624 F.3d 170, 176 (5th Cir. 2010). Even assuming that Gutierrez's daughter was already in the truck when Andres received it, the district court did not err in concluding that Andres' choosing to drive a truck containing over twenty kilograms of cocaine and a four-year-old girl from Laredo to Chicago constitutes an "affirmative act" involving a minor in the offense. Accordingly, the district court did not err in applying the § 3B1.4 enhancement.

## CONCLUSION

For the reasons stated above, we AFFIRM the judgment of the district court.