# United States Court of Appeals
## For the First Circuit

No. 11-1134

UNITED STATES OF AMERICA,

Appellee,

v.

CRAIG SPARKS,

Defendant, Appellant.

No. 11-1143

UNITED STATES OF AMERICA,

Appellee,

v.

BENJAMIN MICHAUD,

Defendant, Appellant.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. William G. Young, U.S. District Judge]

Before

Howard, Circuit Judge,
Souter,[*] Associate Justice,
and Stahl, Circuit Judge.

---

[*]     Hon. David H. Souter, Associate Justice (Ret.) of the Supreme Court of the United States, sitting by designation.

Jeffrey W. Langholtz for appellant Craig Sparks.
Roger A. Cox for appellant Benjamin Michaud.
Robert E. Richardson, Assistant United States Attorney, with whom Carmen Ortiz, United States Attorney, was on brief, for appellee.

————————————

March 26, 2013

————————————

**STAHL, Circuit Judge**. In December 2009, federal agents, acting without a warrant, placed a global positioning system (GPS) tracker on a car used by appellant Craig Sparks. The agents used the tracker to locate the car at the scene of a bank robbery and then to chase down the car on the highway after it fled. A search of the car revealed evidence tying Sparks and his fellow appellant Benjamin Michaud to the bank robbery, leading to their indictment. Sparks and Michaud now appeal the district court's denial of their motion to suppress that evidence, arguing that, under the Supreme Court's recent decision in United States v. Jones, 132 S. Ct. 945 (2012), the agents' use of the GPS tracker was a Fourth Amendment "search" that required a warrant. We affirm without reaching that question, because we conclude that the agents' conduct fits within the good-faith exception to the exclusionary rule.

## I. Facts & Background

The facts of this case are not disputed. The Federal Bureau of Investigation (FBI) suspected Sparks of committing three bank robberies in late 2009. Accordingly, in the early hours of December 24, 2009, FBI agents affixed a GPS tracker to a black Chrysler sedan registered to Sparks's mother but used by Sparks himself. At the time, the Chrysler was parked in a private parking lot used by tenants of two adjacent residential buildings, including Sparks himself. The agents did not have a warrant to place the tracker on the car.

The GPS tracker enabled the agents to track the car's location in real time by logging onto a website.  The tracker had its own battery and thus drew no power from the car.  In fact, the tracker's battery failed shortly after installation, prompting the agents to replace the battery and reattach the tracker on December 29.

On January 4, 2010 (eleven days after the tracker's initial installation), the agents, using the tracker, located the Chrysler in Waltham, Massachusetts.  When the agents reached the car at approximately 12:15 p.m., it was parked near the intersection of Ash and Crescent Streets, unoccupied but with the engine running.  The agents took up position nearby to watch the car.

Roughly ten minutes later and two blocks away, two men entered the Bank of America branch on Moody Street, wearing dark clothing and ski masks and brandishing what appeared to be handguns.  They demanded money.  After obtaining approximately $10,676 in cash, they left the bank, and fled in a red SUV with the license plate number 4205YN.

Moments later, the same red SUV pulled up across from the Chrysler and two men in dark hooded sweatshirts, one of whom carried a dark-colored bag, emerged.  They ran to the Chrysler, climbed in, and drove off.  The watching agents tried to follow, but became ensnarled in traffic.  Thanks to the GPS tracker,

however, they located the Chrysler heading north on Route 128 and caught up to it. As the car passed through Lexington, a Massachusetts State Police cruiser attempted to pull it over, but the Chrysler's driver slammed on the brakes, sending the car into a ditch along the side of the highway. The two occupants fled into the woods, temporarily evading the agents' grasp.

A quick search of the car revealed two BB guns that resembled the weapons brandished by the bank robbers. A subsequent, more thorough search uncovered further incriminating evidence, including clothing and latex gloves like those worn by the robbers, a knife and a dagger, identification belonging to both defendants, and a screwdriver. (The latter was relevant because the red SUV's ignition had been "popped," allowing it to be started with a screwdriver. The SUV turned out to have been stolen in Charlestown.) Investigators also found, in the woods into which the suspects fled, $1,381 in cash and a bag containing two dark hooded sweatshirts.

The Lexington Police apprehended defendant Michaud later that afternoon. He was found with roughly $9,284 in cash (bearing money bands from the bank), two black ski masks, and white latex gloves. He was also wearing mismatched shoes, the mates of which were found in the Chrysler. Sparks proved somewhat harder to catch; he was ultimately collared in Maine a few weeks later.

After both defendants were indicted, Sparks moved to suppress the evidence obtained as a result of the placement of the GPS tracker on the Chrysler. United States v. Sparks, 750 F. Supp. 2d 384, 387 (D. Mass. 2010). Michaud entered a conditional guilty plea and, with the district court's permission, joined Sparks's suppression motion. See id. at 387 n.4. After thoroughly considering the defendants' privacy interests in the parking lot where the GPS tracker was installed, id. at 388-90, the exterior of the car, id. at 390-91, and the information the tracker revealed about their travel, id. at 391-96, the district court denied the motion to suppress. The court concluded that the case was governed by United States v. Knotts, 460 U.S. 276 (1983), which held that using a radio-based tracking device to tail a suspect's car was not a Fourth Amendment search, because "[a] person traveling in an automobile on public thoroughfares has no reasonable expectation of privacy in his movements from one place to another." Id. at 281. Sparks thus entered a guilty plea of his own, and the government agreed that both defendants could appeal the suppression issue (with a caveat as to Michaud that is not relevant here). The district court sentenced each defendant to 188 months' imprisonment and five years' supervised release.

## II.  Analysis

After the district court denied the motion to suppress, the Supreme Court decided United States v. Jones, which held that

"the Government's installation of a GPS device on a target's vehicle, and its use of that device to monitor the vehicle's movements, constitutes a 'search'" for Fourth Amendment purposes. 132 S. Ct. at 949 (footnote omitted). The Justices all agreed that a search had occurred, but differed as to why. The five-Justice majority held that a search occurred because "[t]he Government physically occupied private property for the purpose of obtaining information." Id. The majority opinion emphasized that the government had committed a common-law trespass by installing the tracker on the defendant's car. See id. at 949-50. Justice Sotomayor provided the fifth vote for that position because she agreed that a search occurs "at a minimum" where the government obtains information via physical intrusion, id. at 954 (Sotomayor, J., concurring), but wrote separately to caution that "physical intrusion is now unnecessary to many forms of surveillance," and to suggest that "some unique attributes of GPS surveillance . . . will require particular attention" in future cases, id. at 955. Finally, Justice Alito, joined by Justices Ginsburg, Breyer, and Kagan, took issue with the majority's trespass-based approach but nevertheless found that a search had occurred under the reasonable-expectation-of-privacy test articulated in Katz v. United States, 389 U.S. 347 (1967). See 132 S. Ct. at 957-64 (Alito, J., concurring in the judgment).

Jones thus establishes that the district court's reason for denying the suppression motion in this case -- that "the placement of the GPS device on the vehicle cannot be considered a search," 750 F. Supp. 2d at 391 -- is no longer sound. Consequently, this appeal turns on two questions that remain open after Jones: whether the kind of search recognized in Jones and conducted here requires a warrant (instead of mere probable cause or reasonable suspicion), and, if so, whether the resulting evidence can nevertheless avoid suppression under the good-faith exception to the exclusionary rule articulated in Davis v. United States, 131 S. Ct. 2419 (2011).[1]

Few courts (and no circuits that we know of) have grappled with the warrant question so far, largely because the searches at issue in recent cases occurred pre-Jones, allowing the government to argue, and a number of courts to find, that the good-

---

[1] The government does not dispute that Sparks, who did not own the Chrysler but was its usual driver, has standing to challenge the search here. See Jones, 132 S. Ct. at 949 n.2; cf. United States v. Gibson, -- F.3d ---, 2013 WL 538007, at *18-19 (11th Cir. Feb. 14, 2013). Michaud, on the other hand, seems to have had no equivalent interest in the Chrysler. See Sparks, 750 F. Supp. 2d at 387 n.4. Regardless, his suppression claim would fail for the reasons given below, so we need not consider whether he could show some other basis to challenge the search. See Orin S. Kerr, Does Fourth Amendment Standing Work Differently for Jones Trespass Searches, Traditional Katz Searches, and Long-term Katz Searches?, The Volokh Conspiracy (Feb. 14, 2012, 10:30 p.m.), http://www.volokh.com/2012/02/14/does-fourth-amendment-standing-work-differently-for-jones-trespass-searches-traditional-katz-searches-and-katz-long-term-expectation-of-privacy-searches/.

faith exception would apply even if the searches were unconstitutional. E.g., United States v. Andres, 703 F.3d 828, 834-35 (5th Cir. 2013); United States v. Pineda-Moreno, 688 F.3d 1087, 1090 (9th Cir. 2012); see generally Caleb Mason, New Police Surveillance Technologies and the Good-Faith Exception: Warrantless GPS Tracker Evidence After United States v. Jones, 13 Nev. L.J. 60 (2012). Those courts that have found GPS tracking to require a warrant have typically reached that conclusion by rejecting the government's attempts to fit GPS tracking within the Fourth Amendment's automobile exception. See United States v. Ortiz, 878 F. Supp. 2d 515, 535-36 (E.D. Pa. 2012); United States v. Katzin, No. 11-226, 2012 WL 1646894, at *6 (E.D. Pa. May 9, 2012), appeal pending, No. 12-2548 (3d Cir. argued Mar. 19, 2013). Some have also more broadly considered the balance of privacy and governmental interests at stake, concluding that the scales tip in favor of requiring a warrant. United States v. Ford, No. 11-CR-42, 2012 WL 5366049, at *8 (E.D. Tenn. Oct. 30, 2012); Ortiz, 878 F. Supp. 2d at 530-33; see also Jones, 132 S. Ct. at 955 (Sotomayor, J., concurring) (emphasizing the impact that GPS monitoring can have on a person's privacy); United States v. Maynard, 615 F.3d 544, 562 (D.C. Cir. 2010) (same), aff'd sub nom. Jones, 132 S. Ct. 945. But see United States v. Robinson, No. 11-CR-00361-AGF, 2012 WL 4893643, at *16-17 (E.D. Mo. Oct. 15, 2012) (relying on pre-Jones precedent to find that reasonable suspicion sufficed).

Here, we need not decide whether the government can show that GPS tracking is exempt from "the basic rule" that warrantless searches are per se unreasonable, Arizona v. Gant, 556 U.S. 332, 338 (2009), because we agree with the government's alternative argument: even if the agents' use of the GPS tracker in this case was unconstitutional, their conduct fits within the good-faith exception to the exclusionary rule. Under that exception, as recently explicated in Davis, "searches conducted in objectively reasonable reliance on binding appellate precedent are not subject to the exclusionary rule." 131 S. Ct. at 2423-24. In this case, suppression would be inappropriate because the agents' attachment and monitoring of the GPS tracker was authorized by settled, binding circuit precedent.

**A.      The scope of Davis's good faith exception**

The purpose of the exclusionary rule "is to deter future Fourth Amendment violations." Id. at 2426; see United States v. Leon, 468 U.S. 897, 916 (1984). But the rule's deterrent value must be balanced against the cost it imposes in the form of probative but discarded evidence. See Davis, 131 S. Ct. at 2427. When the police comply with authoritative precedent, only to see the law evolve after the fact, there is nothing to deter; the police cannot modify their conduct to accord with cases not yet decided. See id. at 2428-29, 2434. Thus, in Davis, where the police conducted a vehicle search incident to arrest that strictly

-9-

complied with binding circuit precedent applying the bright-line rule of New York v. Belton, 453 U.S. 454 (1981), suppression of the resulting evidence was not appropriate even though Arizona v. Gant subsequently established that the vehicle search was unlawful. 131 S. Ct. at 2428. Under the same principle, if the warrantless installation and monitoring of the GPS tracker in this case was "objectively reasonable" under then-"binding appellate precedent," suppression is not warranted, even if it turns out that the agents should have gotten a warrant first. Id. at 2423-24.

The parties offer competing visions of what "objectively reasonable reliance on binding appellate precedent" means. Sparks and Michaud posit that, to qualify, the precedent in question must be binding in this circuit (i.e., issued by the Supreme Court or this court) and sufficiently apposite that "reasonable minds" could not dispute the propriety of the police practice in question. A number of district courts in other circuits have adopted similar readings of Davis in the GPS context. E.g., Robinson, 2012 WL 4893643, at *14; Katzin, 2012 WL 1646894, at *9. On the other hand, the government suggests that, in the absence of directly applicable circuit precedent, law enforcement officers may reasonably rely on the decisions of appellate courts outside the circuit. This view, too, has found favor with some district courts in GPS cases, including in this circuit. E.g., United States v. Gordon, No. 11-CR-20752, 2013 WL 791622, at *8 (E.D. Mich. Mar. 4,

2013); <u>United States</u> v. <u>Rose</u>, No. 11-10062-NMG, 2012 WL 4215868, at *4-5 (D. Mass. Sept. 14, 2012); <u>United States</u> v. <u>Oladosu</u>, 887 F. Supp. 2d 437, 442-48 (D.R.I. 2012).

The scope of <u>Davis</u>'s reasonable-reliance-on-precedent test turns on two subsidiary questions: what universe of cases can the police rely on? And how clearly must those cases govern the current case for that reliance to be objectively reasonable? As to the first question, <u>Davis</u> itself establishes that the police certainly may rely on binding circuit precedent. 131 S. Ct. at 2434. The Court's emphasis on the absence of police culpability could be read to imply that good-faith reliance on out-of-circuit appellate precedent is also acceptable. <u>E.g.</u>, <u>Rose</u>, 2012 WL 4215868, at *5. That said, the Court did predict that "defendants in jurisdictions in which [a given Fourth Amendment] question remains open will still have an undiminished incentive to litigate the issue," 131 S. Ct. at 2433, suggesting the opposite.[2] In any event, we need not consider today whether <u>Davis</u> can be extended to reach reliance on non-binding authority, because we conclude that

---

[2]    We note that the federal and state appellate courts that had already adopted a <u>Davis</u>-type reliance-on-precedent exception before <u>Davis</u> was decided uniformly restricted that exception to reliance on binding precedent. <u>E.g.</u>, <u>United States</u> v. <u>Davis</u>, 598 F.3d 1259, 1266-67 (11th Cir. 2010), <u>aff'd</u>, 131 S. Ct. 2419. Likewise, the two appellate courts to consider the question since <u>Davis</u> have read <u>Davis</u> to require reliance on "the caselaw of the jurisdiction." <u>Briscoe</u> v. <u>Maryland</u>, 30 A.3d 870, 883 (Md. 2011); <u>accord</u> <u>United States</u> v. <u>Debruhl</u>, 38 A.3d 293, 298 (D.C. 2012); <u>see also</u> Mason, <u>supra</u>, at 82.

binding circuit precedent authorized the FBI agents' conduct in this case.  But before we explain that conclusion, we think it helpful to briefly touch on the second question: how apposite must the relied-on precedent be?

The Davis Court emphasized, and Davis himself did not dispute, that the officers in that case "strict[ly]" and "scrupulously" complied with circuit precedent.  131 S. Ct. at 2428, 2434.  Thus, the Court was not faced with a situation where the police conduct was "consistent with the language of a Fourth Amendment rule . . . announced in a case with clearly distinguishable facts," or where "the relevant precedent did not directly announce any general rule but involved highly analogous facts."  Id. at 2437 (Breyer, J., dissenting).  Nor does it appear that any other circuit has yet considered the boundaries of permissible reliance after Davis.

Before Davis was decided, however, a number of state and federal courts (including the Eleventh Circuit, as affirmed in Davis itself) had already adopted a Davis-type reliance-on-precedent exception to the exclusionary rule.  They unanimously held -- and we agree -- that the exception is available only where the police rely on precedent that is "clear and well-settled." United States v. Davis, 598 F.3d 1259, 1266 (11th Cir. 2010), aff'd, 131 S. Ct. 2419; see also United States v. McCane, 573 F.3d 1037, 1042 (10th Cir. 2009) (search was "wholly consistent with and

supported by" precedent); State v. Baker, 229 P.3d 650, 663 (Utah 2010) (precedent was "settled"); State v. Dearborn, 786 N.W.2d 97, 107 (Wis. 2010) (officers relied on "clear and settled law"). Indeed, the circuits that recognized the exception pre-Davis stressed that their "precedent on a given point must be unequivocal" for suppression to be withheld. Davis, 598 F.3d at 1266; accord United States v. Curtis, 635 F.3d 704, 714 n.28 (5th Cir. 2011); United States v. Buford, 632 F.3d 264, 276 & n.9 (6th Cir. 2011). We do not think Davis undermined their position. See Mason, supra, at 64, 69 (arguing that Davis approved of the Eleventh Circuit's approach below and therefore "the officer's conduct must have been expressly authorized by clearly established law" for Davis to apply). Rather, this emphasis on the clear application of the precedent to the case at hand is consistent with Davis's focus on deterrence; where judicial precedent does not clearly authorize a particular practice, suppression has deterrent value because it creates an "incentive to err on the side of constitutional behavior." Davis, 598 F.3d at 1266-67 (quoting United States v. Johnson, 457 U.S. 537, 561 (1982)) (internal quotation marks omitted); see Davis, 131 S. Ct. at 2435 (Sotomayor, J., concurring in the judgment); Wayne A. Logan, Police Mistakes of Law, 61 Emory L.J. 69, 86-87 (2011); Mason, supra, at 71-72.[3]

---

[3] The requirement that the precedent be clear and well-settled is also consistent with the other circumstances in which the Court has applied the good-faith exception. In particular,

**B.**         **<u>Davis</u>'s good faith exception applies here**

The foregoing principles require us to find that suppression would be improper here.  This is certainly a closer question in this circuit than in those that had directly addressed the propriety of warrantless GPS tracking prior to <u>Jones</u>.  <u>E.g.</u>, <u>Pineda-Moreno</u>, 688 F.3d at 1090.  Nevertheless, we think the Supreme Court's decision in <u>Knotts</u>, 460 U.S. 276, and ours in <u>United States</u> v. <u>Moore</u>, 562 F.2d 106 (1st Cir. 1977), are sufficiently clear and apposite to trigger <u>Davis</u> here.

In <u>Moore</u>, we considered the government's warrantless installation and use of "beepers" (battery-powered radio transmitters) to track the movements of the defendants' vehicles on public roads.  562 F.2d at 110-13.  We concluded that "[w]hile a driver has no claim to be free from observation while driving in public, he properly can expect not to be carrying around an uninvited device that continuously signals his presence."  <u>Id.</u> at 112.  Balancing these considerations and the needs of law enforcement, we held that "while the lessened expectancy of privacy associated with motor vehicles justifies the use of beepers without a warrant to track vehicles, this can be done only if the officers have probable cause at the time."  <u>Id.</u> at 112-13.  Importantly for

---

reliance on a clear and well-defined judicial rule that is later abrogated is analogous to reliance on a subsequently invalidated statute, <u>Davis</u>, 598 F.3d at 1267, a circumstance that triggers the good-faith exception under <u>Illinois</u> v. <u>Krull</u>, 480 U.S. 340 (1987).

present purposes, we focused almost exclusively on the defendants' privacy interests in their movements, dismissing "the trespass involved in affixing the beepers to the underbody of the vehicles" as "so minimal as to be of little consequence."  Id. at 111.

As the Moore court predicted, id. at 110, the issue of beeper surveillance eventually reached the Supreme Court.  In Knotts, the Court held that "[a] person traveling in an automobile on public thoroughfares has no reasonable expectation of privacy in his movements from one place to another."  460 U.S. at 281.  For that reason, the use of a beeper to track the defendant's movements on public roads involved "neither a 'search' nor a 'seizure' within the contemplation of the Fourth Amendment."  Id. at 285.  Knotts thus abrogated Moore's probable-cause requirement for beeper surveillance, but it did not address the issue of a beeper's installation on the defendant's property, see id. at 286 (Brennan, J., concurring in the judgment), leaving undisturbed Moore's conclusion that the trespass involved in attaching a beeper to a car was "of little consequence."[4]

After Knotts and Moore, then, two points were settled in this circuit.  First, using a beeper to monitor a person's

---

[4]      Likewise, United States v. Karo, 468 U.S. 705 (1984), held that no search or seizure occurred where the government installed a beeper in an article that was later transferred to the defendant (although subsequently monitoring the beeper inside a private home was a search); like Knotts, Karo did not consider a scenario in which the government installs a tracking device on property that already belongs to the defendant.  See id. at 712.

movements in a car on public roads did not implicate the Fourth Amendment, because there was no privacy interest to be infringed. Id. at 281, 285 (majority opinion). Second, the trespass involved in attaching a beeper to a car was, by itself, so insignificant as to be essentially irrelevant for Fourth Amendment purposes. Moore, 562 F.2d at 111-12; see also United States v. Karo, 468 U.S. 705, 712-13 (1984) (noting that "a physical trespass is only marginally relevant to the question of whether the Fourth Amendment has been violated"). The question is thus whether the FBI's reliance on these clear and settled principles to install a GPS tracker instead of a beeper, and then to monitor it for over a week, was objectively reasonable. We think it was.[5]

First, we conclude that Moore's dismissal of the initial, trespassory installation of the beeper as essentially immaterial would not apply any differently to the installation of a GPS tracker. Indeed, the defendants have offered us no reason to conclude that the act of affixing a GPS tracker to the undercarriage of a car is, by itself, any different from installing a beeper in the same fashion. Thus, Moore squarely supported the agents' attachment of the GPS tracker to the Chrysler when it

_____

[5] A skeptic might wonder whether the agents in this case actually had Moore and Knotts in mind when they attached the GPS tracker to the Chrysler in December 2009, but we do not believe (and the defendants do not argue) that Davis requires the government to show actual, as well as objectively reasonable, reliance. See Krull, 480 U.S. at 355.

-16-

happened (although Jones has since abrogated Moore's conclusion on the trespass question, see 132 S. Ct. at 949).

The closer question is whether Knotts clearly and expressly authorized the subsequent monitoring of the GPS tracker for eleven days. Like the officers in Knotts, the FBI agents in this case used an electronic tracking device to follow the movements of a car. But they did two things differently: they used a GPS unit instead of a beeper, and they tracked the car for eleven days instead of a number of hours. Do either of these differences place the agents' conduct beyond the scope of what Knotts clearly permitted?

On this record, we think the fact that the device was a GPS tracker rather than a beeper does not render Knotts inapplicable. Certainly, a GPS tracker is more capable than a beeper,[6] "but nothing inheres in the technology to take it out of Knotts's holding." United States v. Cuevas-Perez, 640 F.3d 272, 278 (7th Cir. 2011) (Flaum, J., concurring), cert. granted and judgment vacated, 132 S. Ct. 1534 (2012). And the defendants have not identified anything about this particular GPS device -- except

---

[6]   Compare Renée McDonald Hutchins, Tied Up in Knotts? GPS Technology and the Fourth Amendment, 55 UCLA L. Rev. 409, 414-21 (2007) (describing the development and capabilities of GPS technology), with Clifford S. Fishman, Electronic Tracking Devices and the Fourth Amendment: Knotts, Karo, and the Questions Still Unanswered, 34 Cath. U. L. Rev. 277, 281-82 (1985) (describing beeper technology circa 1985); see also People v. Weaver, 909 N.E.2d 1195, 1199 (N.Y. 2009) (distinguishing GPS technology from the beeper in Knotts).

for the duration of its use, discussed below -- that could meaningfully distinguish it from the beeper in Knotts. See United States v. Hernandez, 647 F.3d 216, 221 (5th Cir. 2011) (upholding the warrantless use of a GPS tracker that functioned essentially like the beeper in Knotts); see also Knotts, 460 U.S. at 282, 284 (emphasizing that technological enhancement and increased police efficiency do not make otherwise-lawful surveillance suspect under the Fourth Amendment). Thus, Knotts clearly authorized the agents to use a GPS-based tracking device in the place of a beeper. See Andres, 703 F.3d at 835 (finding "any possible technological differences between a 1981 'beeper' and the GPS device used in this case" insufficient to make the government's pre-Jones reliance on a Fifth Circuit beeper precedent unreasonable for good-faith purposes).

That brings us to the duration of the monitoring: eleven days here, versus less than a day in Knotts -- not a trivial difference. But Knotts gave scant reason to think that the duration of the tracking in that case was material to the Court's reasoning. Rather, the Court appeared to apply a blanket rule that "[a] person traveling in an automobile on public thoroughfares has no reasonable expectation of privacy in his movements from one place to another"; no such expectation attaches to information that is, like one's public movements, "voluntarily conveyed to anyone who wanted to look." 460 U.S. at 281. Knotts did note that

-18-

abusive "dragnet type" surveillance might be governed by "different constitutional principles," id. at 284, but there was no suggestion in the Knotts opinion that this rather brusque dismissal of the defendant's Orwellian warnings imposed a concrete temporal limitation on the case's apparently unqualified holding.  Indeed, at the time of the search in this case, Knotts was widely and reasonably understood to stand for the proposition that the Fourth Amendment simply was not implicated by electronic surveillance of public automotive movements, because the latter was merely a more efficient "substitute . . . for an activity, namely following a car on a public street, that is unequivocally not a search within the meaning of the amendment."  United States v. Garcia, 474 F.3d 994, 996-97 (7th Cir. 2007); see also Gordon, 2013 WL 791622, at *8 (concluding that "Jones represents an unexpected development that has shifted law enforcement's understanding of" Knotts and Karo); Mason, supra, at 65 (until Jones, "everyone thought" the "key fact" in Knotts and Karo "was that the cars were being monitored while they were on public roads, where anyone could see them").

Ultimately, then, Knotts and Moore authorized the agents' conduct here.  Knotts's apparent bright-line rule that the Fourth Amendment is unconcerned with police surveillance of public automotive movements is analogous to Belton's bright-line rule authorizing officers to search the passenger compartment of an arrestee's car.  See Davis, 132 S. Ct. at 2424.  Thanks to Jones

-19-

and <u>Gant</u>, respectively, both rules have turned out not to be as categorical as they seemed, but that is not a reason to penalize the police for applying them faithfully before those clarifications occurred. <u>Id.</u> at 2428. As the Eleventh Circuit did in <u>Davis</u> with regard to the pre-<u>Gant</u> <u>Belton</u> rule, we emphasize that the apparent clarity of the pre-<u>Jones</u> <u>Knotts</u> rule is "critical to our decision." <u>Davis</u>, 598 F.3d at 1267. Also crucial is the fact that <u>Moore</u> plugged the gap left by <u>Knotts</u> and <u>Karo</u>: until <u>Jones</u>, it was the law of this circuit that the trespass involved in installing a tracking device on a car was, by itself, immaterial for Fourth Amendment purposes. <u>Moore</u>, 562 F.2d at 111-12.

In sum: at the time of the GPS surveillance in this case, settled, binding precedent in the form of <u>Knotts</u> and <u>Moore</u> authorized the agents' conduct. <u>Davis</u> thus precludes suppression of the resulting evidence, even if the agents' actions violated the Fourth Amendment (which we do not decide). Accordingly, we affirm the district court's ruling, albeit on different grounds. <u>See</u> <u>United States</u> v. <u>Sanchez</u>, 612 F.3d 1, 4 (1st Cir. 2010).

### III. Conclusion

<u>Davis</u>'s good-faith exception is not a license for law enforcement to forge ahead with new investigative methods in the face of uncertainty as to their constitutionality. "The justifications for the good-faith exception do not extend to situations in which police officers have interpreted ambiguous

precedent or relied on their own extrapolations from existing caselaw." Davis, 598 F.3d at 1267.  The good-faith exception is, however, properly applied in cases like this one (or Davis itself), where new developments in the law have upended the settled rules on which the police relied.  Accordingly, we affirm the district court's denial of Sparks and Michaud's motion to suppress.