# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**
August 10, 2023

Lyle W. Cayce
Clerk

No. 21-20586

United States of America,

*Plaintiff—Appellee*,

*versus*

Jesus Leonardo Esquivel-Carrizales,

*Defendant—Appellant*.

_____

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:20-CR-161-1

_____

Before Richman, *Chief Judge*, and Stewart and Douglas, *Circuit Judges*.

Per Curiam:[*]

Jesus Leonardo Esquivel-Carrizales (Esquivel) appeals the denial of his motion to suppress controlled substances recovered during a traffic stop. The district court determined that the stop was justified by the officers' reasonable suspicion of drug trafficking. Esquivel agreed to proceed with a stipulated bench trial and did not contest the facts necessary to convict him. Because the Government agreed, for this case only and in light of the

_____

[*] This opinion is not designated for publication. *See* 5th Cir. R. 47.5.

No. 21-20586

COVID-19 pandemic, Esquivel did not intentionally waive his appeal by not expressly reserving it, we consider the merits of that appeal. However, because the district court correctly determined that reasonable suspicion of drug trafficking existed, we affirm.

**I**

Esquivel was arrested as a passenger in a car in which officers discovered methamphetamine and cocaine. Prior to the stop of that car, Brownsville Homeland Security (HSI Brownsville) agents had an ongoing drug trafficking investigation which had "identified several people who were truck drivers or employed . . . in the commercial cargo business, driving 18-wheelers," including Jose Santos-Esquivel (Santos). After a cooperating defendant told HSI Brownsville that Santos "was looking for a compartment to be specially produced for him that was presumably going to be used to conceal narcotics," HSI Brownsville had the cooperating defendant build the "external diesel tank for like a diesel truck" located in the "back" or "bed" of a truck that Santos frequently drove, and HSI Brownsville obtained a warrant for a GPS tracker which they attached to the truck. HSI Brownsville suspected Santos was "trafficking narcotics from the Rio Grande Valley to Houston."

On the day of the stop in question, HSI Brownsville received an alert that the tracker "indicated" the truck "was heading towards Houston." HSI Brownsville contacted the "point of contact" for HSI Houston, Agent Rogers, around 8 p.m., and conveyed that there was "a vehicle coming north from Brownsville that was possibly loaded with narcotics," handed over the tracking information, and asked Houston to "proceed with surveillance." Agent Rogers's team located Santos's truck at around 10 p.m. in a parking lot across the street from the Galleria mall. It was five days before Christmas, so the mall was open late. A white Volkswagen (VW) "pulled up about a

space over from" the truck and two men, Esquivel and Alejandro Pena, had come from one of the stores with "a shopping cart, or a basket, or something" and were loading items into the VW. The men began talking with the driver of the pickup truck, "t[ook] something out of the truck," and then "walk[ed] back and forth talking to [Santos]." It is not clear from the record what that "something" was.

Agent Rogers arrived on scene after Esquivel and Pena were back at the VW and was informed by a member of his team what had occurred. Agent Rogers then saw Esquivel having a conversation with Santos and get inside the truck for "ten, fifteen minutes" while Pena "was on the phone and getting in and out of the car." After Esquivel "got back out" of the truck, Esquivel and Pena "arranged some stuff in the trunk" of the VW.

At this point, "based on the totality of the circumstances," including that all of this was occurring in a dark parking lot, Agent Rogers and the other officers on scene "thought [they] were observing somebody transferring narcotics to another vehicle." Esquivel and Pena then got into the VW (Pena driving and Esquivel in the passenger seat) and both vehicles left the parking lot. Agent Rogers relayed the information about the investigation to Harris County Sheriff's officers and "request[ed] that they engage in a traffic stop of the [VW]" while he pursued Santos in the pickup truck. Deputy Sweeney pulled the VW over around 10:49 p.m. for speeding and twice failing to signal a lane change.

Deputy Sweeney asked Pena for his license and proof of insurance, and Pena "was really nervous," "fumbling for his wallet," and "d[idn't] want to make eye contact." This "start[ed] to make [Deputy Sweeney] nervous," so Deputy Sweeney had Pena sit in the back of the police car. As Deputy Sweeney went back to the VW, Esquivel started to get out of the car. Deputy Sweeney told him to get back in, took his identification, and went

back to the police car to start to run background checks. Deputy Sweeney "started to run" the information but Esquivel "started to get out on [him] again." It is unclear based on the record what time the checks started or if the driver's check or Esquivel's check were completed. At some point, which Deputy Sweeney believes was after he spoke with Pena, Deputy Sweeney "asked for another unit" "because the driver was really nervous, and then the passenger kept getting out on me. He didn't want to be in the car." At 10:57 p.m., eight minutes after Deputy Sweeney was dispatched, Pena gave consent to search the car, in which the officers discovered narcotics.

Esquivel was charged with possession and conspiracy to possess with intent to distribute 500 grams or more of a mixture containing methamphetamine and five kilograms or more of a mixture containing cocaine in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A), and 846, and 18 U.S.C. § 2. He pleaded not guilty and filed a motion to suppress. After an evidentiary hearing and supplemental briefing, the district court granted the motion in part as to a different stop but denied it as to the Houston stop in question here. Thereafter, Esquivel proceeded to trial and a jury was selected and sworn. However, before opening statements, a juror tested positive for COVID-19. The district court granted a mistrial based on "manifest necessity and the COVID crisis and the sickness of one of our jurors," and explained that the court would proceed with "a stipulated bench trial, as agreed by the defendant and defendant's counsel."

Esquivel waived his right to a jury trial and proceeded with the stipulated bench trial. The Government abandoned "the enhancement paragraphs" which would have subjected Esquivel to a ten-year mandatory minimum sentence. Esquivel did not "agree" with the facts as recited by the Government but did not "contest" them. He also did not express a desire to preserve an appeal of the adverse pretrial suppression ruling. Relying on the

uncontested facts, the district court determined that the elements of the offenses were satisfied and found Esquivel guilty on both counts. Esquivel waived the preparation of the presentence investigation report, and the district court sentenced him to time served, followed by three years of supervised release. Esquivel filed a timely notice of appeal.

## II

Ordinarily, because Esquivel "proceed[ed] to trial on an admission or a stipulation of the facts necessary for conviction" without "expressly reserving the right to appeal from [his] adverse suppression ruling," he would have waived any appeal of the suppression issue or rendered any potential error harmless.[1]  However, this case presents unique circumstances. Esquivel proceeded to a jury trial and a jury was selected and sworn in; it was only because of the COVID-19 pandemic, which was then in its beginning stages, that a mistrial was declared and he proceeded with a stipulated bench trial. Esquivel argues that any waiver of his right to appeal the suppression ruling was not knowing or intentional because of the confusion surrounding the early days of the pandemic and the fact that he did not "express 'clear understanding' that he was giving up that right." The Government agrees that "[f]or this case only, and due to the COVID-related adjustments the parties made . . . Esquivel did not intend to waive his right to appeal."  In light of the Government's agreement and the unique circumstances of this case, we agree that Esquivel has not waived his right to appeal the suppression ruling.

## III

We turn to the merits of the suppression ruling. "When reviewing the denial of a motion to suppress, we review questions of law *de novo* and

---

[1] *See United States v. Najera*, 915 F.3d 997, 1004 (5th Cir. 2019) (emphasis omitted).

No. 21-20586

findings of fact for clear error."[2]   "'Whether an officer had reasonable suspicion to support a stop is treated as a question of law.'   Nonetheless, this Court views the evidence 'in the light most favorable to the prevailing party in the district court—in this case, the Government.'"[3]

When analyzing the legality of an investigative stop, we engage in a two-part inquiry.   "First, we consider whether the officer's decision to make the stop was justified at its inception.   Second, we determine whether or not the officer's subsequent actions were reasonably related in scope to the circumstances that caused him to stop the vehicle in the first place."[4] Esquivel argues that no reasonable suspicion of drug trafficking arose, and, because of that, the stop was impermissibly prolonged to investigate the traffic violations.

If there was reasonable suspicion of drug trafficking, we need not analyze whether the stop was impermissibly prolonged to investigate the traffic violations.[5]   "For a traffic stop to be justified at its inception, an officer

---

[2] *United States v. McKinney*, 980 F.3d 485, 491 (5th Cir. 2020).

[3] *United States v. Broca-Martinez*, 855 F.3d 675, 678 (5th Cir. 2017) (quoting *United States v. Castillo*, 804 F.3d 361, 364 (5th Cir. 2015)).

[4] *United States v. Bass*, 996 F.3d 729, 737 (5th Cir. 2021) (citation omitted) (citing *United States v. Pack*, 612 F.3d 341, 349-50 (5th Cir.), *opinion modified on other grounds on denial of reh'g*, 622 F.3d 383 (5th Cir. 2010)).

[5] *See United States v. Villafranco-Elizondo*, 897 F.3d 635, 642 (5th Cir. 2018) ("The record before us does not reveal when the license check was complete because Woody exited his vehicle before receiving the results.   While the check was running, Woody continued to question Villafranco-Elizondo, eventually securing his consent to search the truck and the trailer.   Accordingly, we cannot determine whether the license check was complete when Villafranco-Elizondo consented to the search.

Yet we need not answer that question if, when the license check began, Woody had already developed reasonable suspicion that another crime was afoot.   Where an officer develops reasonable suspicion of another crime—e.g., drug trafficking—during the course of a traffic stop, he may prolong the suspect's detention until he has dispelled that newly-formed suspicion." (citing *United States v. Brigham*, 382 F.3d 500, 507 (5th Cir. 2004) (en banc))).

6

No. 21-20586

must have an objectively reasonable suspicion that some sort of illegal activity, such as a traffic violation, occurred, or is about to occur, before stopping the vehicle."[6]   "Although a mere 'hunch' does not create reasonable suspicion . . . the level of suspicion the standard requires is 'considerably less than proof of wrongdoing by a preponderance of the evidence,' and 'obviously less' than is necessary for probable cause."[7] "Our assessment of reasonable suspicion is based on the totality of the circumstances."[8]   "We give due weight to the officer's factual inferences because officers may 'draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'"[9]

Because there was "some degree of communication" between HSI Brownsville, Agent Rogers, and Deputy Sweeney, "reasonable suspicion can vest through [their] collective knowledge."[10]   At the time of the stop, evidence had shown that HSI Brownsville was conducting an ongoing investigation into drug trafficking with Santos as one of its targets.  Santos had asked a cooperating defendant to modify his truck by building a hidden compartment, and the hidden compartment had been installed.  On the day in question, Santos drove to Houston from Brownsville in the truck with the hidden compartment.  When Santos had come to Brownsville in the past, "he

---

[6] *United States v. Andres*, 703 F.3d 828, 832 (5th Cir. 2013) (quoting *United States v. Lopez–Moreno*, 420 F.3d 420, 430 (5th Cir. 2005)).

[7] *Navarette v. California*, 572 U.S. 393, 397 (2014) (citations omitted) (first quoting *Terry v. Ohio*, 392 U.S. 1, 27 (1968); and then quoting *United States v. Sokolow*, 490 U.S. 1, 7 (1989)).

[8] *Bass*, 996 F.3d at 737 (citing *United States v. Powell*, 732 F.3d 361, 369 (5th Cir. 2013)).

[9] *United States v. Smith*, 952 F.3d 642, 648 (5th Cir. 2020) (quoting *United States v. Arvizu*, 534 U.S. 266, 273 (2002)).

[10] *Bass*, 996 F.3d at 737 (first citing *Powell*, 732 F.3d at 369; and then quoting *United States v. Ibarra*, 493 F.3d 526, 530 (5th Cir. 2007)).

No. 21-20586

was meeting with other people who were documented as being involved in drug trafficking" and who "either had been arrested before the . . . incident in question, or have since been arrested for narcotics trafficking and/or bulk cash smuggling." "[F]rom Brownsville to Houston is pretty much the main destination for narcotics" and a "drug trafficking corridor." Further, it is "very" common for drug traffickers to use a hidden compartment while travelling up from the Rio Grande Valley. As to the specifics of the night in question, Santos met with Pena and Esquivel, who were driving a VW, in a dark parking lot. Santos, Esquivel, and Pena talked and walked back and forth between the truck and the VW, and Pena took "something" from the back of the truck and put it in the trunk of the VW. Esquivel got into the truck for ten or fifteen minutes while Pena "was on the phone and getting in and out of the [VW]." After Esquivel got out of the truck, he and Pena "arranged some stuff in the trunk" of the VW and drove off. Right after the stop began but before any checks were run, Deputy Sweeney observed that Pena "was really nervous," "fumbling for his wallet," and "d[idn't] want to make eye contact," which made Deputy Sweeney nervous. In addition, Esquivel kept getting out of the VW and "didn't want to be in the [VW]." "[T]hese factors" and the "reasonable inferences" that "may be drawn from them," would allow a reasonable person to suspect that [Esquivel] was engaging in illegal activity."[11]

Further, "[i]n determining whether reasonable suspicion exists, an officer's inferences based on knowledge gained through specialized training and experience routinely play a significant role in law enforcement investigations."[12] The HSI Brownsville officer working this case received training on narcotics trafficking, including "the whole tactical side of

_____

[11] *See Lopez-Moreno*, 420 F.3d at 433.

[12] *Bass*, 996 F.3d at 738 (citing *Kansas v. Glover*, 140 S. Ct. 1183, 1189-90 (2020)).

electronic surveillance, then going forward through, like, interviewing, drug recognition, general history of different trafficking methods and drug trafficking organizations." When asked what else the hidden compartment could be used for besides transporting drugs from Brownsville to Houston, he testified: "I can't think of anything. The only—only other scenario would be taking an empty compartment and bringing back bulk cash currency." Agent Rogers, the Houston officer who surveilled the parking lot, had sixteen years' experience working for HSI including "many narcotics investigations." On the night in question, based on the totality of the circumstances, Agent Rogers and the other members of law enforcement thought they had "observ[ed] somebody transferring narcotics to another vehicle." Agent Rogers watched the stop of Esquivel and Pena from a distance after losing track of Santos because he was "just making sure that . . . everything was okay, and that they found what they—what we thought was narcotics."

Esquivel objects to many of the factors outlined above. For instance, he argues that it was five days before Christmas and the mall was open late, so the exchange could have been shoppers exchanging gifts. However, "we have consistently recognized that reasonable suspicion 'need not rule out the possibility of innocent conduct.'"[13] Further, he argues his route is not dispositive, but, as we have explained, while "'the probativeness of a particular defendant's route is minimal,' . . . we have consistently considered travel along known drug corridors as a relevant—even if not dispositive—piece of the reasonable suspicion puzzle."[14] Finally, Esquivel objects to considering demeanor, but though "[n]ervousness, standing alone, generally

---

[13] *Navarette v. California*, 572 U.S. 393, 403 (2014) (quoting *Arvizu*, 534 U.S. at 277).

[14] *Smith*, 952 F.3d at 649 (quoting *United States v. White*, 584 F.3d 935, 952 (10th Cir. 2009)).

is not sufficient to support reasonable suspicion,"[15] it "is indeed supportive of a reasonable suspicion,"[16] especially because Deputy Sweeney explained the driver was more nervous than Deputy Sweeney thought appropriate. Because there was reasonable suspicion of drug trafficking, we do not consider whether the traffic stop might have been unreasonably prolonged to investigate only traffic violations.

*      *      *

For the foregoing reasons, we AFFIRM.

---

[15] *United States v. Macias*, 658 F.3d 509, 520 (5th Cir. 2011).

[16] *United States v. McKinney*, 980 F.3d 485, 495 (5th Cir. 2020) (citing *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000)).