# United States Court of Appeals
## For the First Circuit

---

No. 22-1121

UNITED STATES,

Appellee,

v.

GILBERT PEREZ,

Defendant, Appellant.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. D. Brock Hornby, U.S. District Judge]

---

Before

Barron, Chief Judge,
Howard and Montecalvo, Circuit Judges.

---

Jamesa J. Drake, with whom Drake Law LLC was on brief, for appellant.

Brian S. Kleinbord, Assistant United States Attorney, with whom Darcie N. McElwee, United States Attorney, was on brief, for appellee.

---

December 28, 2023

---

**BARRON, Chief Judge.** Gilbert Perez seeks to vacate his federal drug conviction on the ground that the United States District Court for the District of Maine wrongly denied his motion to suppress the fruits of a warrantless search of his backpack. The District Court rested the denial on our decision in United States v. Eatherton, 519 F.2d 603 (1st Cir. 1975), which upheld a similar warrantless search under the search-incident-to-arrest exception to the warrant requirement of the Fourth Amendment to the U.S. Constitution, id. at 609-11. Because we reject Perez's contention that intervening decisions of the Supreme Court of the United States have stripped Eatherton of controlling force, we affirm the judgment of conviction.

## I.

When reviewing the denial of a motion to suppress evidence, "'we recite the facts as found by the district court, consistent with record support,' including the testimony from the motion hearing." United States v. Tom, 988 F.3d 95, 97 (1st Cir. 2021) (quoting United States v. Soares, 521 F.3d 117, 118 (1st Cir. 2008) (cleaned up)). Massachusetts State Trooper Jason Conant was conducting a patrol on the evening of August 30, 2019, when he saw a pickup truck with Maine license plates stop in a McDonald's

parking lot in Lawrence, Massachusetts. The driver was later identified as Perez.

Perez exited the truck, donned a backpack, and walked towards a residential area near the parking lot. Conant became suspicious of the out-of-state truck, as well as Perez's behavior, and alerted other state troopers in the area to watch for Perez.

Minutes after Perez left the parking lot, a second Massachusetts state trooper, Shawn McIntyre, saw Perez exiting a taxi on a nearby street. McIntyre watched Perez start to walk in the direction of the McDonald's where the truck was parked.

McIntyre stopped the taxi and saw large quantities of cash at the feet of the taxi's passenger. McIntyre then radioed Conant, informing him of the cash and the suspicion that Perez had participated in a drug transaction with the taxi's passenger.

Perez, still wearing the backpack, returned to the McDonald's parking lot. Conant pulled his (unmarked) car into the parking lot and exited the car. Roughly simultaneously, Conant began to yell "state police," and Perez began to run from the parking lot. Conant gave chase.

About twenty yards from the parking lot, Perez tripped and fell. Conant caught up to Perez after his fall and pinned him to the ground. A third state trooper, Ryan Dolan, pulled up in a patrol car.

Conant removed the backpack from Perez as Dolan was handcuffing Perez's hands behind his back. Dolan then sat Perez on the pavement.

After Perez was handcuffed, Conant placed the backpack on Dolan's car and opened and searched the backpack. Perez was not in reaching distance of the backpack when the search of the backpack took place.

Conant discovered fentanyl and cocaine in the backpack. Perez was then searched and formally arrested.

Perez was indicted on March 12, 2020, on a federal drug-related charge. He moved to suppress the drugs, contending that the backpack's search violated the Fourth Amendment.[1]

The government opposed the motion on the ground that the search was constitutional under Eatherton. The government also argued that, in any event, the search was conducted in good-faith reliance on Eatherton. See Davis v. United States, 564 U.S. 229, 232 (2011) (holding that "[police] searches conducted in objectively reasonable reliance on binding appellate precedent are not subject to the exclusionary rule").

The District Court denied Perez's motion without reaching the good-faith issue. See United States v. Perez, Crim. No. 2:20-CR-39-DBH-01, 2021 WL 2953671 (D. Me. July 14, 2021).

---

[1] Perez challenged several other aspects of his arrest in the District Court but raises none of those issues on appeal.

- 4 -

The District Court found that "[t]he police had probable cause to arrest Perez when they handcuffed him," and it "treat[ed] [the police] as having effectively arrested him then," although the District Court also found that it was only later that Perez was "formally" arrested. Id. at *2. The District Court separately found, moreover, that Perez's handcuffing occurred "as" Conan "ripped the backpack off" of Perez. Id. With that factual predicate in place, the District Court reasoned that the search of the backpack was lawful because, when there is probable cause for an arrest, Eatherton allows for the warrantless "search [of] a container found on a person being arrested," id. at *3, and our Court had not "'unmistakably' cast Eatherton 'into disrepute,'" id. at *4 (quoting Eulitt ex rel. Eulitt v. Me., Dep't of Educ., 386 F.3d 344, 349 (1st Cir. 2004)).

Perez entered a conditional guilty plea, which preserved his right to appeal his conviction based on the District Court's Eatherton-based denial of his motion to suppress. He then filed this timely appeal. We review the District Court's "factual findings for 'clear error'" and its "legal conclusions . . . de novo." United States v. Rodríguez-Pacheco, 948 F.3d 1, 6 (1st Cir. 2020) (quoting United States v. Camacho, 661 F.3d 718, 723-24 (1st Cir. 2011)).

- 5 -

## II.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures" by providing that "no Warrants shall issue, but upon probable cause." U.S. Const. amend. IV. Our focus is on the exception to the Fourth Amendment's warrant requirement for a search incident to an arrest. See United States v. Robinson, 414 U.S. 218 (1973).

Perez does not dispute that the exception covers his backpack's search if Eatherton remains good law. He contends only that Eatherton does not because of either United States v. Chadwick, 433 U.S. 1 (1977), or Arizona v. Gant, 556 U.S. 332 (2009), or both together.

Under the law of the circuit doctrine, newly constituted panels must follow the rulings of preceding panels that are "directly (or even closely) on point," United States v. Guzman, 419 F.3d 27, 31 (1st Cir. 2005), "even where the succeeding panel disagrees with the prior one," United States v. Guerrero, 19 F.4th 547, 552 (1st. Cir 2021). The doctrine recognizes an exception, however, when "[a]n existing panel decision [is] undermined by controlling authority, subsequently announced, such as an opinion of the Supreme Court, an en banc opinion of the circuit court, or a statutory overruling," Williams v. Ashland Eng'g Co., 45 F.3d 588, 592 (1st Cir. 1995), or when an "authority that postdates the

- 6 -

original decision, although not directly controlling, nevertheless offers a sound reason for believing that the former panel, in light of fresh developments, would change its collective mind," United States v. Barbosa, 896 F.3d 60, 74 (1st Cir. 2018) (quoting Williams, 45 F.3d at 592).

The latter exception is very limited, as it applies only when the new authority "provides a clear and convincing basis" to conclude that the prior panel would have changed its mind. Guerrero, 19 F.4th at 552. For that reason, we have described cases that trigger this exception as "hen's-teeth-rare." San Juan Cable LLC v. P.R. Tel. Co., 612 F.3d 25, 33 (1st Cir. 2010).

We begin by reviewing Eatherton and describing its rationale. We then explain why we conclude that Eatherton still controls.

**A.**

The defendant in Eatherton was Gilbert Eatherton. 519 F.2d. at 605. A suspected bank robber, he was walking down a street while carrying a briefcase when agents of the Federal Bureau of Investigation ("FBI") spotted him. Id. at 609.

The FBI agents called for Eatherton to come to their car, and he did so. Id. When he was "close to the vehicle the agents told him he was under arrest [and] instructed him to drop the briefcase and [lie] spread eagle on the ground." Id. He complied with the commands, and the FBI agents "thoroughly frisked"

- 7 -

him, handcuffed him, and placed him in the back of their vehicle. Id. The FBI agents then picked up the briefcase, opened it, and found a loaded gun and three brown ski masks, all of which were later admitted as evidence at trial. Id.

Eatherton did not dispute that there was probable cause to arrest him, and he "concede[d] that the agents could have seized the briefcase consonant with the [F]ourth [A]mendment." Id. at 610. But he argued that the agents "should have obtained a search warrant before investigating [the briefcase's] contents," and that, because the agents did not, the search of his briefcase violated the Fourth Amendment. Id. He thus argued that the fruits of the search of the briefcase had to be suppressed because that search could not be justified merely by the fact of his arrest and the right to search his person that his arrest entailed. Id.

Eatherton relied chiefly on the Supreme Court's decision in Chimel v. California, 395 U.S. 752 (1969). There, the Court held that the bare fact that an arrest occurred inside a home did not justify a warrantless search of the entirety of the premises. Id. at 763. The Court also held that although a warrantless search of the area of the home within the "immediate control" of the arrestee was reasonable if justified "by the need to seize weapons and other things which might be used to assault an officer or effect an escape" or "by the need to prevent the destruction of evidence of the crime," these "justifications are absent where a

search is remote in time or place from the arrest." Id. at 764 (quoting Preston v. United States, 376 U.S. 364, 367 (1964)).

Eatherton argued based on Chimel that the briefcase's search violated the Fourth Amendment because "any urgency to inspect the interior of the briefcase was completely removed once he had been subdued and the [brief]case removed from his possession and beyond his possible reach." Eatherton, 519 F.2d at 610. But, although the Eatherton panel acknowledged that there was "some logical cogency" to the contention, id., the panel held that the search of the briefcase's interior was reasonable.

The Eatherton panel first pointed out that Chimel had cited "with apparent approval Draper v. United States, in which a search virtually identical to that at issue [in Eatherton] was upheld." Id. (citation omitted). Draper involved a criminal defendant who had evidence admitted against him at his trial that was obtained from the warrantless search of a bag that he was carrying when he was arrested. 358 U.S. 307, 310 (1959).

The Eatherton panel next explained that other courts of appeals "had little apparent difficulty" rejecting Chimel-based arguments for prohibiting warrantless "searches identical to that contested" by Eatherton. 519 F.2d at 610. Notably, in each of those cases, as in Draper, the warrantlessly-searched container was similar in size to the briefcase in Eatherton. See United States v. Maynard, 439 F.2d 1086, 1087 (9th Cir. 1971) (rejecting

the argument that a warrantless search of a suitcase the defendant was carrying when arrested was unconstitutional because the search was "incident to the lawful arrest of its carrier"); United States v. Mehciz, 437 F.2d 145, 146-48 (9th Cir. 1971) (relying on Draper to reject the contention that Chimel governed a warrantless search of a suitcase carried at the time of arrest); United States ex rel. Muhammad v. Mancusi, 432 F.2d 1046, 1047-48 (2d Cir. 1970) (rejecting as "frivolous" a Chimel-based challenge to the post-arrest search at a police station of a briefcase in the "immediate possession" of the defendant at the time of the arrest when the defendant conceded that the search "would have been proper if [it] had been conducted at the time [and place] of his arrest").

The Eatherton panel then addressed three Supreme Court decisions that post-dated both Chimel and the other circuits' rulings that had upheld searches like the search of Eatherton's briefcase: Robinson, 414 U.S. at 218; Gustafson v. Florida, 414 U.S. 260 (1973); and United States v. Edwards, 415 U.S. 800 (1974). The Eatherton panel explained that this trio showed that the Chimel-based challenge could not "be sustained." Eatherton, 519 F.2d at 610.

In Robinson, the Court held that the warrantless search of a "crumpled up cigarette package" found in the "breast pocket of the heavy coat [the arrestee] was wearing" at the time of his arrest did not violate the Fourth Amendment, even though the

- 10 -

arresting officer had neither "any subjective fear of the [arrestee]" or any "susp[icion] that the [arrestee] was armed." 414 U.S. at 222-23, 236. The Court explained that because the "custodial arrest of a suspect based on probable cause is a reasonable intrusion under the Fourth Amendment[,]" a search "of the person" of an arrestee incident to that arrest is per se reasonable. Id. at 235. Robinson thus rejected the contention that a more limited pat-down -- such as the limited frisk permitted in Terry v. Ohio, 392 U.S. 1 (1968) -- was all that was allowed for a search incident to the arrest. See Robinson, 414 U.S. at 235. And the Court then explained that "[h]aving in the course of a lawful search come upon the crumpled package of cigarettes, [the officer who had conducted the search of the arrestee's person] was entitled to inspect [the package,] and when his inspection revealed the heroin capsules, he was entitled to seize them as 'fruits, instrumentalities, or contraband' probative of criminal conduct." Id. at 236 (quoting Harris v. United States, 331 U.S. 145, 154-55 (1947)).

Robinson relied on the rationales for the search-incident-to-arrest exception to the warrant requirement to justify the ruling that the warrantless search of the cigarette package was reasonable. Those rationales are rooted in a concern for officer safety, the governmental interest in the preservation of evidence, and the diminished privacy interest of an arrestee

due to the dominion over their person effected by the arrest itself. See Robinson, 414 U.S. at 226; see also Riley v. California, 573 U.S. 373, 386 (2014) ("Robinson regarded any privacy interests retained by an individual after arrest as significantly diminished by the fact of the arrest itself.").

In Gustafson, which was decided the same day as Robinson, the Court went a step further than it had in Robinson. It held that a warrantless search of a cigarette box found in the "front coat pocket of the coat [the arrestee] was wearing" during a search of the arrestee's person at the time of his arrest, 414 U.S. at 262, was per se reasonable under Robinson even though the search of the cigarette box occurred after the arrestee had been placed "in the back seat of the squad car," id. at 262 n.2, and even though there was no "subjective fear of the [arrestee]" or "susp[icion] that the [arrestee] was armed," id. at 266.

The defendant in Eatherton tried to distinguish Robinson and Gustafson based on the relatively large size of his briefcase and the fact that it was not concealed in his pocket but held in his hand at the time of the arrest. But the Eatherton panel concluded that "[t]he line which [Eatherton] attempts to draw placing the briefcase beyond the search of his 'person' which Robinson and Gustafson expressly approve is one requiring gossamer distinctions." Eatherton, 519 F.2d at 610. And Eatherton went on to state that "[t]here is no indication that the result in those

cases would have been any different had the cigarette packages been in the defendants' hands rather than in their pockets or if they had been dropped to the ground in response to [a] police command." Id. Moreover, Eatherton explained, "[w]hile a briefcase may be a different order of container than a cigarette box, it is not easy to rest a principled articulation of the reach of the [F]ourth [A]mendment upon the distinction." Id.

The Eatherton panel also noted that the defendant's argument was "not unlike" Justice Marshall's in "his dissent to Gustafson and Robinson." Id. The Eatherton panel then cited to the portion of that dissent that relied on Chimel to dispute the majority's decision to uphold the warrantless search of the container in that case. Id. (citing Robinson, 414 U.S. at 256-58 (Marshall, J., dissenting)). While the argument advanced in that portion of Justice Marshall's dissent "may have analytical appeal," the Eatherton panel concluded, the view set forth there "does not presently represent the law." Id.

The Eatherton panel wound up its analysis by invoking Edwards, which was decided the year after Robinson and Gustafson. The Court held in Edwards that the Fourth Amendment permitted the warrantless search of clothing that an arrestee was wearing at the time of his arrest even though the search of the clothing occurred the day after the arrest and while the arrestee was in jail. Edwards, 415 U.S. at 808-09. Edwards reasoned that "the legal

- 13 -

arrest of a person" reduces the arrestee's expectation of privacy in items "in his immediate possession, including his clothing." Id. at 805, 808 (emphasis added) (quoting United States v. DeLeo, 422 F.2d 487, 493 (1st Cir. 1970)).

The Eatherton panel observed that the Court in Edwards, "after noting that the courts of appeals have generally permitted searches of both 'the person and the property in his immediate possession,'" stated that "it is difficult to perceive what is unreasonable about the police examining and holding as evidence those personal effects of the accused that they already have in their lawful custody as the result of a lawful arrest." Eatherton, 519 F.2d at 610 (first quoting Edwards, 415 U.S. at 803; then quoting Edwards, 415 U.S. at 806). The search in Edwards had been made "in the station house after an arrest," Eatherton acknowledged. But Eatherton explained that there was no reason to "doubt that [those observations from Edwards] apply equally to searches in the field immediately incident to the arrest." Id. Eatherton thus held that, as the defendant in the case before it had "conceded the agents properly seized the briefcase as . . . incident to his arrest . . . any expectation of privacy which he held with regard to the briefcase was taken out of 'the realm of protection from police interest in weapons, means of escape, and evidence.'" Id. at 610-11 (quoting Edwards, 415 U.S. at 808-09).

- 14 -

**B.**

As this extended review of Eatherton reveals, the panel in that case did more than determine that the rule set forth in Robinson, Gustafson, and Edwards rather than the rule set forth in Chimel controlled the briefcase's search. The panel also made clear that it based that determination on the considered judgment that, for purposes of the rule laid down in Robinson and Gustafson, a search of a container (at least of the "order" of a briefcase, see Eatherton, 519 F.2d at 610) in the hands of an arrestee at the time of the arrest was no different from a search of a container in the pocket of an arrestee at that time.[2] As Eatherton put it, a "line which [would] plac[e] the briefcase beyond the search of [the] 'person' which Robinson and Gustafson expressly approve is one requiring gossamer distinctions." 519 F.2d at 610. And, to that point, the Eatherton panel explained that, although a briefcase was of "a different order of container from a cigarette box," it would not be "easy" to make any such distinction for the

_____

[2] We understand Eatherton's statement that "[t]here is no indication that the result in [Robinson and Gustafson] would have been any different had the cigarette packages been . . . dropped to the ground in response to police command," 519 F.2d at 610, to mean only that the determination of whether an item is "of the person" of the arrestee or in the arrestee's "area of immediate control" is unaffected by post-arrest, police-ordered conduct. After all, at the same time that the FBI agents told Eatherton to drop the briefcase, they also told him he was under arrest. Id. at 609.

relevant Fourth Amendment purposes in a "principled" manner. Id. Eatherton then reasoned that, as a result, Edwards required the conclusion that the briefcase's search was reasonable, given that Edwards concluded that the search of the personal property found on the person of the arrestee in that case was reasonable. In that regard, Eatherton concluded based on Edwards that because "the agents properly seized the briefcase . . . incident to [Eatherton's] arrest. . . . any expectation of privacy which he held with regard to the briefcase was taken out of 'the realm of protection from police interest in weapons, means of escape, and evidence.'" Id. at 610-11 (quoting Edwards, 415 U.S. at 808-09).

Perez does not suggest that there is any relevant difference between his backpack and the briefcase in Eatherton or that the backpack was not on his back when the District Court found that he was arrested, notwithstanding that the District Court found that he was "formally" arrested only thereafter. He thus accepts that his appeal lacks merit if Eatherton controls. His sole contention, therefore, is that Eatherton does not control due to post-Eatherton developments.

## C.

The post-Eatherton developments that Perez has in mind are two Supreme Court precedents: Chadwick and Gant. He contends that, whether separately or together, they undermine (even if they do not overrule) Eatherton's holding that a briefcase in the hands

- 16 -

of an arrestee at the time of arrest is no different from the cigarette containers involved in Robinson and Gustafson. But we cannot agree -- even if we account for post-Chadwick and post-Gant out-of-circuit precedent that is at odds with Eatherton. Thus, we conclude that Eatherton remains binding on us as a panel.[3]

**1.**

We start with Perez's arguments about Chadwick, which was decided two years after Eatherton. Perez contends that Chadwick is a significant intervening precedent because Eatherton's rationale depended on the determination that there was "no indication" that the result in either Robinson or Gustafson "would have been any different had the cigarette packages been in the defendants' hands rather than in their pockets or if they had been dropped to the ground in response to police command." Eatherton, 519 F.2d at 610. Yet, Perez asserts, Chadwick shows that is not so.

---

[3] Neither Perez nor the government addresses whether, even if Eatherton does not control the outcome of this case, it is controlled by our post-Chadwick ruling in United States v. Maldonaldo-Espinosa, 968 F.2d 101, 104 (1st Cir. 1992) (rejecting an argument that the search of a bag "on the table next to [the handcuffed defendant] and within reach" could be justified only by an exigency because "government agents, when arresting a person, may constitutionally search an arrested person's nearby . . . bag, without a warrant . . . whether or not [the agents] have reason to fear that the carry-on bag contains a weapon, another threat to their safety, or destructible evidence"). Because we conclude that Eatherton controls here, we need not evaluate the search of Perez's backpack under Maldonaldo-Espinosa.

The Supreme Court held in Chadwick that the warrantless search of an arrestee's "double-locked, 200-pound footlocker" violated the Fourth Amendment when the search of that container was conducted beyond "the area from within which [the arrestees] might gain possession of a weapon or destructible evidence," Chadwick, 433 U.S. at 5 (quoting Chimel, 395 U.S. at 763), and was not "justified by any other exigency," id. at 15. But nothing in Chadwick disturbs either Robinson's ruling upholding the warrantless search of a cigarette container in the pocket of an arrestee at the time of the lawful arrest or Gustafson's ruling upholding such a search even when it is performed after the cigarette container has been removed from the arrestee's immediate area of control.

In that regard, Chadwick expressly states that, "[u]nlike searches of the person [under] United States v. Robinson [and] United States v. Edwards, searches of possessions within an arrestee's immediate control cannot be justified by any reduced expectations of privacy caused by the arrest." 433 U.S. at 16 n.10 (emphasis added) (citations omitted). We do not read that passage, in expressly reaffirming Robinson and Edwards, to be silently rejecting the parts of their holdings that blessed the searches of the personal property in those cases that was found on the person of the defendants. Nor do we read that passage, in reaffirming those two cases without mentioning Gustafson, to be

silently rejecting Gustafson's extension of Robinson's rule regarding a search of personal property on the person of the arrestee at the time of the arrest to cover the search of such property even after that property was no longer in the arrestee's area of immediate control.

Moreover, nothing in Chadwick purports to address how to treat a container that an arrestee has in hand at the time of arrest relative to a container that an arrestee has in a pocket at that time. In fact, Chadwick had no reason to address that question because the arrestee was not holding the container in Chadwick. Nor, for that same reason, did Chadwick have reason to address whether the arrestee's dropping of such a container in response to a police command upon arrest would change the calculus. So, not surprisingly, Chadwick does not purport to address that scenario either.

True, Chadwick does state that "[o]nce law enforcement officers have reduced luggage or other personal property not immediately associated with the person of the arrestee to their exclusive control, and there is no longer any danger that the arrestee might gain access to the property to seize a weapon or destroy evidence, a search of the property is no longer an incident of the arrest." 433 U.S. at 15 (emphasis added). But the emphasized language shows that Chadwick's "immediate area of control" rule does not apply to "personal property . . .

- 19 -

immediately associated with the person of the arrestee," id., and so merely operates in parallel to the holdings in Robinson, Gustafson, and Edwards. Thus, because Chadwick does not address what, if any, personal property carried or worn by the arrestee at the time of the arrest beyond the cigarette packages in Robinson and Gustafson and the clothing in Edwards constitutes "personal property . . . immediately associated with the person of the arrestee," Chadwick does not address whether a held briefcase like the one in Eatherton is to be treated the way that the personal property in those three cases was. As a result, Chadwick gives no "indication that the result in [Robinson and Gustafson] would have been any different had the cigarette packages been in the defendants' hands rather than in their pockets or if they had been dropped to the ground in response to police command." Eatherton, 519 F.2d at 610.

Simply put, Eatherton was concerned about drawing distinctions between types of containers in an arrestee's "immediate possession," Eatherton, 519 F.2d at 610 (quoting Edwards, 415 at 803), at the time of arrest -- a problem that is hardly trivial given the range of containers people may carry beyond cigarette packages, from holsters to purses to backpacks. But, as Chadwick had no reason to address that line-drawing problem, it cannot offer any insight into how to resolve that

problem.  We thus do not see how Chadwick undermines Eatherton's rationale for upholding the search of the briefcase in Eatherton.

**2.**

Perez does argue that Gant undermines Eatherton even if Chadwick does not.  But here, too, we disagree.

Gant relied on Chimel in holding that courts had wrongly interpreted New York v. Belton, 453 U.S. 454 (1981), to have held that all personal property in an automobile was categorically searchable incident to an occupant's arrest.  Gant, 556 U.S. at 348-52.  Perez contends that it follows from Gant that the search of his backpack is no different from the car search in that case.

But, Gant, like Chadwick, said nothing about whether the rule of Robinson (as applied in Gustafson and Edwards) governs a container that an arrestee is carrying at the time of the arrest (or that is dropped in response to police command at that time).  Indeed, Gant did not address carried personal property at all, because it concerned only whether a car may be searched incident to a lawful arrest of an occupant of the car.  Thus, Gant is no different from Chadwick in the relevant respect, and so provides no basis for our concluding that Eatherton has been stripped of its controlling force.  For, like Chadwick, Gant has literally nothing to say about where the line should be drawn in searches

- 21 -

incident to arrest when it comes to things an arrestee carries at the time of the arrest.[4]

### D.

The dissent appears to accept that neither Chadwick nor Gant directly overrules Eatherton. The dissent nonetheless contends that we still can be confident that if the panel in Eatherton knew what we do in consequence of Chadwick and Gant, that panel would have abandoned its hard line about the difficulty of drawing hard lines. As the dissent sees it, the panel in that event would have "centered its analysis around 'immediate control' rather than shoehorning the search of a closed container into being 'of the [arrestee's] person.'" Dissent at 49. But we see no "clear and convincing" case for that conclusion. Guerrero, 19 F.4th at 552.

Chadwick does make clear that no per se rule establishes that "luggage" within the "immediate area of control" of an

---

[4] Perez does at points argue that, under Gant, the location of a container "relative to the arrestee at the time of arrest is irrelevant" when determining whether the container can be searched without a warrant, because all such searches should be evaluated based on the container's location at the time of its search. But, as Gustafson and Edwards show, the application of Robinson's categorical rule depends, as to at least some personal property, on the property's location at the time of the arrest and not at the time of the search. And, as we have explained, there is nothing in Gant that undermines Robinson, Gustafson, or Edwards. We thus do not see how Perez's time-of-the-search contention, insofar as it is meant to address all containers, can be reconciled with Robinson as it was applied in Gustafson and Edwards.

arrestee at the time of the arrest may be warrantlessly searched. See Chadwick, 433 U.S. at 16 n.10. Thus, Chadwick does prompt the question of why it would be per se reasonable to search a briefcase that is held (or dropped upon police command) by an arrestee at the time of the arrest.

But Chadwick applied the "immediate control" test to a container that was not carried by the arrestee at the time of the arrest. By contrast, the Eatherton panel was addressing only how to treat a container that an arrestee was carrying at that time, so the Eatherton panel did not purport to suggest that the Robinson rule would apply to nearby containers not carried by the arrestee at the time of the arrest. As a result, Chadwick fails to provide a clear and convincing reason for us to conclude that the Eatherton panel would have reversed course had it known about Chadwick.

That is especially so given that Chadwick, in a passage that the dissent mentions but otherwise ignores, expressly distinguishes searches of personal property "immediately associated" with the person of the arrestee (like the personal property at issue in Robinson, Gustafson, and Edwards) from searches of personal property of the arrestee that is merely within the "immediate control" of the arrestee. Id. at 15. For, because of that distinction, Chadwick did not address whether principled lines could be drawn in this context between types of containers that are carried by the arrestee at the time of arrest -- whether

those types of containers are cigarette packs, wallets, purses, fanny packs, holsters, or briefcases.  Yet Eatherton's clearly expressed concern was that such lines could not be drawn.  See Eatherton, 519 F.2d at 610.

Gant similarly offers no relevant insight into the proper way to resolve the line-drawing problem that troubled the Eatherton panel.  Because Gant addresses only searches of automobiles, it says nothing about what distinctions might be tenable when it comes to containers that an arrestee is carrying at the time of the arrest.

We thus fail to see how we could be confident that Chadwick or Gant -- or even the two taken together -- would have led the Eatherton panel to "center" its analysis of the briefcase on the "immediate control" question.  Were the panel to have done so, it would have been forced to draw the very distinctions between the types of carried containers that it concluded were too "gossamer" to make.  Eatherton, 519 F.2d at 610.  But not a word in either Chadwick or Gant would give the Eatherton panel reason to think that, contrary to the panel's initial assessment, distinctions of substance as to such containers could be made in a "principled" manner.  See id.

Of course, the dissent is right that, in the wake of Chadwick and Gant, other circuits have drawn the kinds of distinctions that Eatherton refused to make.  See United States v.

Knapp, 917 F.3d 1161, 1168 (10th Cir. 2019) (holding that the search of a purse was governed by the Chimel standard because the purse "was not concealed under or within [the defendant's] clothing" and "was easily capable of separation from her person"); United States v. Shakir, 616 F.3d 315, 321 (3rd Cir. 2010) ("[A] search is permissible incident to a suspect's arrest when, under all the circumstances, there remains a reasonable possibility that the arrestee could access a weapon or destructible evidence in the container or area being searched."). But post-Eatherton precedent is not uniformly at odds with Eatherton, as even the dissent acknowledges in describing how other circuits reacted to Chadwick -- at least prior to Gant. See Dissent at 39.

Indeed, some circuits after Chadwick but before Gant appeared to follow Eatherton's lead in categorizing certain carried items as "of the person." Two months after Chadwick was decided, for example, the Fourth Circuit assumed that warrantless searches of objects carried in an arrestee's hands were permissible as searches "of the person incident to an arrest." United States v. Wyatt, 561 F.2d 1388, 1391 (4th Cir. 1977) (search of a notebook that arrestee retrieved from his car after being arrested). And four years later, in United States v. Graham, the Seventh Circuit explained that a "shoulder purse carried by a person at the time he is stopped lies within the scope of a warrant authorizing the search of his person." 638 F.2d 1111, 1114 (7th Cir. 1981).

Although the question in Graham was whether the purse was "of the person" for purposes of a search warrant authorizing a search of the person, and there was no issue of a warrantless search incident to an arrest, the Seventh Circuit's reasoning nevertheless aligns neatly with Eatherton's. As the Seventh Circuit explained, "[c]ontainers . . . while appended to the body, are so closely associated with the person that they are identified with and included within the concept of one's person. To hold differently would be to narrow the scope of a search of one's person to a point at which it would have little meaning." Id. And almost two decades later, the Eighth Circuit followed the Seventh Circuit's lead and explained that a purse, for purposes of the search-incident-to-arrest exception, was an object "immediately associated" with one's person, even though the purse in that case was also within the arrestee's area of "immediate control." Curd v. City Court, 141 F.3d 839, 843-44 (8th Cir. 1998). Indeed, the Eighth Circuit agreed "with the general view" of other courts that "concluded that a purse, like a wallet, is an object 'immediately associated' with the person." Id. (citations omitted).[5]

_____

[5] To be sure, four months later, the Eighth Circuit approved a backpack search because "the search of his person and backpack was lawful as a search incident to arrest," seemingly distinguishing "person" from "backpack" and citing a case for the idea that possessions within "immediate control" can be searched. United States v. Oakley, 153 F.3d 696, 698 (8th Cir. 1998).

- 26 -

Thus, to the extent that post-Chadwick precedents from sister circuits may shed light on what the Eatherton panel would have done with the benefit of them, we do not see how the pre-Gant precedents of that ilk do. Even though some of those post-Chadwick but pre-Gant precedents adopt the dissent's position, these precedents are, as a group, too varied to justify application of the second exception to the law-of-the-circuit doctrine.

The dissent does also cite to post-Gant sister-circuit cases that extend Gant to non-vehicle contexts. See, e.g., United States v. Davis, 997 F.3d 191, 193 (4th Cir. 2021) ("Gant applies beyond the automobile context to the search of a backpack."); United States v. Knapp, 917 F.3d 1161, 1168 (10th Cir. 2019) ("[A]lthough Gant specifically addressed the search of an automobile, its principles apply more broadly."); United States v. Cook, 808 F.3d 1195, 1199 n.1 (9th Cir. 2015) ("We do not read Gant's holding as limited only to automobile searches because the Court tethered its rational to the concerns articulated in Chimel, which involved a search of an arrestee's home."); Shakir, 616 F.3d at 318 ("[T]he Government contends that the rule of Gant applies only to vehicle searches. We do not read Gant so narrowly."). But these out-of-circuit cases also fail to show what is required to justify applying the second exception to the law-of-the-circuit doctrine.

Even after Gant, the Supreme Court recognized in Riley v. California that "[l]ower courts applying Robinson and Chimel . . . have approved searches of a variety of personal items carried by an arrestee" and cited to a case where the D.C. Circuit upheld the search of a purse incident to the arrest of its owner. 573 U.S. 373, 392-93 (2014) (citing, inter alia, United States v. Lee, 501 F.2d 890, 892 (D.C. Cir. 1974)). And Riley repeatedly described Gant as a case involving automobile searches without in any way suggesting that Gant had worked a reformation of Robinson's rule for searches of at least some personal property on the person of the arrestee at the time of the arrest. See 573 U.S. at 398 ("But Gant relied on 'circumstances unique to the vehicle context'" (quoting Gant, 556 U.S. at 343)); id. at 385 ("Gant added . . . an independent exception for a warrantless search of a vehicle's passenger compartment . . . . That exception stems not from Chimel . . . but from 'circumstances unique to the vehicle context.'" (quoting Gant, 556 U.S. at 343)). Thus, the post-Gant cases from sister circuits do not show in a clear and convincing way that the Eatherton panel -- with the benefit of Gant -- would have ruled the same way that those circuits had.

We note, too, that Riley made its observation about how other circuits had applied Robinson post-Chadwick while addressing whether the rule of Robinson extends to the search of the data on an arrestee's carried cellphone. Riley, 573 U.S. at 392-93. Yet,

in doing so, the Court both expressly reaffirmed that Robinson survived Chadwick as to at least some personal property on the person of the arrestee at the time of arrest, id. at 384, 394, and highlighted the fact that Chadwick expressly exempted from its "immediate control" test "personal property . . . immediately associated with the person of the arrestee[,]" id. at 384 (first alteration in original) (quoting Chadwick, 433 U.S. at 15).

Finally, although Riley carefully explained that the officer-safety, evidence-collection, and diminished-privacy rationales for Robinson's rule did not apply to a cell phone's data, the Court said nothing in doing so that "clear[ly] and convincing[ly]" indicates, Guerrero, 19 F.4th at 552, that Robinson's rule has no application to a container that is of the same "order" as a briefcase, Eatherton, 519 F.2d at 610. Riley does suggest that, based on those rationales, a 200-pound double-locked storage trunk may fall outside Robinson's rule even if the arrestee happens to be dragging the trunk along behind him. See Riley, 573 U.S. at 394. But Eatherton did not itself suggest otherwise. Rather, Eatherton held only that a briefcase that the arrestee was carrying at the time of the arrest fell within Robinson's rule because the distinction between such a container when held in hand and a cigarette package when carried in a pocket was "gossamer" and because it was "not easy to rest a principled

- 29 -

articulation of the reach of the [F]ourth [A]mendment upon the distinction." Eatherton, 519 F.2d at 610.

We note, too, that Riley's comment about the potential exclusion of the dragged trunk from Robinson's rule was based on the notion that "[m]ost people cannot lug around" a trunk containing "every piece of mail . . . every picture . . . or every book or article they have read" and on the observation that "nor would they have any reason to attempt to do so." Id. at 393-94. Yet, of course, most people can carry a briefcase and often have reason to do so. Indeed, Perez himself does not argue that Riley is the case that would have led the Eatherton panel to rule other than it did, as he contends only that Riley merely excluded digital content from Robinson's rule.

**E.**

We close by addressing what may be our key point of disagreement with our dissenting colleague -- the proper scope of the second exception to the law-of-the-circuit doctrine. As we see it, the whole point of the doctrine is to ensure that individual panels of our court do not -- in an ad hoc way -- second-guess prior circuit precedents just because the panels are convinced that those precedents are wrong. Thus, the determination of whether a prior panel decision binds a future panel cannot depend on whether there are sound reasons to conclude that the prior panel got it wrong. Yet, the post-Eatherton body

- 30 -

of precedent that the dissent invokes shows, in our view, that there are merely reasons of that sort when it comes to Eatherton, as that body of caselaw fails to provide "a clear and convincing basis to believe that the [Eatherton] panel would have decided the issue differently." Guerrero, 19 F.4th at 552.

A comparison of this case with Guerrero -- which is our most recent case to find the second exception to the law-of-the-circuit doctrine to be satisfied -- underscores the point. In finding the second exception to the doctrine applicable there, we relied on an unbroken string of intervening Supreme Court precedents. Id. at 555-57. Those precedents, we explained, each had made sweeping statements that contradicted the very rationale that the prior panel had relied on in ruling that a warrantless search had to be subjectively and not just objectively aimed at addressing an exigency to be lawful. See id., 19 F.4th at 554. And while we acknowledged that none of those precedents directly overruled the prior panel decision, we pointed out that one of them rejected the application of a subjective test with respect to a home search, notwithstanding that the prior panel had applied that test to a search of an automobile. See id. at 555-56 (citing Maryland v. Buie, 494 U.S. 325 (1990)). We thus explained that, given the heightened privacy interests at stake in home searches, it would be most strange to conclude that the prior panel would stick with its position that a subjective test had to be used for

a search of a car if that panel had the benefit of the intervening Supreme Court precedent.  See id. at 557.

Here, by contrast, the relevant intervening Supreme Court precedents are Chadwick and Gant -- neither of which even addresses a search of personal property carried by an arrestee at the time of the arrest, let alone whether and how to distinguish between types of such personal property, at least as between briefcases and cigarette packages.  We thus do not see how we could reason from either of those precedents to the determination that there is a clear and convincing basis on which to conclude that the Eatherton panel would have decided differently with the benefit of knowing what we now do.  And the fact that sister circuits have relied on Chadwick and Gant to chart a different course than Eatherton cannot provide the required clarity, as the second exception to the law-of-the-circuit doctrine does not apply just because several other circuits have chosen not to follow one of our prior rulings.

Accordingly, we conclude that, under the law-of-the-circuit doctrine, the en banc process supplies the proper means for our Court to reconsider Eatherton in light of all that has transpired in its wake.  Through that process, the Court as a whole rather than this single panel can examine Eatherton and the question of whether Eatherton's line-drawing concern justifies its decision to treat an openly carried container like a briefcase

the way that the Supreme Court treated the cigarette containers in Robinson and Gustafson and the clothing in Edwards.  And so, until then, the rule laid down in Eatherton controls this case about the things we carry, as Perez makes no argument that Eatherton can be distinguished on the facts.[6]

## III.

For the reasons set out above, the District Court's judgment of conviction is **affirmed**.


**-Dissenting Opinion Follows-**

---

[6] We do recognize that a determination that a Fourth Amendment precedent of our court remains binding may well bear on whether the good-faith exception to the warrant requirement applies.  See Davis, 564 U.S. at 232 ("[P]olice . . . searches conducted in objectively reasonable reliance on binding appellate precedent are not subject to the exclusionary rule.").  But, given the vital role that the law-of-the-circuit doctrine plays in ensuring the orderly process of lower court adjudication, that fact provides no reason for us to be less strict in applying the law-of-the-circuit doctrine than we have long been.

**MONTECALVO, <u>Circuit Judge, dissenting</u>**.  I view <u>United States</u> v. <u>Eatherton</u>, 519 F.2d 603 (1st Cir. 1975), differently than the majority, particularly as to how the exception to the law-of-the-circuit doctrine applies here.  Further, applying modern Supreme Court precedent, I would find that the search of Perez's backpack violated his Fourth-Amendment rights.  I would also find that the good-faith exception is not applicable here.  Accordingly, and for the reasons that follow, I would reverse the decision of the district court on Perez's motion to suppress and vacate the judgment of conviction.

## I. The Law-of-the-Circuit Doctrine

This appeal arises from the denial of a motion to suppress the warrantless search of the backpack Perez was wearing at the time of his arrest.  As the majority notes, that search should be viewed through the scope of "the basic rule that 'searches conducted outside the judicial process, without prior approval by judge or magistrate are <u>per se</u> unreasonable under the Fourth Amendment -- subject only to a few specifically established and well-delineated exceptions.'"  <u>Arizona</u> v. <u>Gant</u>, 556 U.S. 332, 338 (2009) (quoting <u>Katz</u> v. <u>United States</u>, 389 U.S. 347, 357 (2009)).  One such exception is that of the search incident to arrest.  <u>Id.</u>  There are two grounding principles to that exception: (1) to protect officer safety and (2) to preserve evidence.  <u>Id.</u>

The development of this exception has evolved over decades of caselaw, both in the Supreme Court and this Circuit. To that end, as to our prior decisions, we are bound by the law-of-the-circuit doctrine. United States v. Barbosa, 896 F.3d 60, 74 (1st Cir. 2018). However, there are exceptions to that doctrine, as it is "neither a straightjacket nor an immutable rule." Id. (quoting Carpenters Local Union No. 26 v. U.S. Fid. & Guar. Co., 215 F.3d 136, 142 (1st Cir. 2000)). One exception is "when the holding of a previous panel is contradicted by subsequent controlling authority, such as a decision by the Supreme Court, an en banc decision of the originating court, or a statutory overruling." Id. Another exception exists "when 'authority that postdates the original decision, although not directly controlling, nevertheless offers a sound reason for believing that the former panel, in light of fresh developments, would change its collective mind.'" Id. (quoting Williams v. Ashland Eng'g Co., 45 F.3d 588, 592 (1st Cir. 1995)).

The majority's opinion rests on a case decided by a panel of this court nearly half a century ago: United States v. Eatherton, 519 F.2d 603 (1st Cir. 1975). Admittedly, should Eatherton remain good law, it is controlling here. In my view, however, the second exception to the law-of-the-circuit doctrine, delineated above, is applicable under these circumstances. In light of the major developments to the search-incident-to-arrest

- 35 -

exception postdating Eatherton, including modern binding and persuasive precedent on the propriety of warrantless searches incident to arrest, I think that the Eatherton panel would have come to a different conclusion. To justify this conclusion, an analysis of Eatherton itself and a brief history of the developments following Eatherton's publication is necessary.

## A. **Eatherton**

As described in the majority opinion, Eatherton involved the warrantless search of a briefcase that the arrestee was holding when first approached by law enforcement. 519 F.2d at 609. After the arrestee was frisked and placed in the back of a police vehicle, the officers searched the briefcase, and the contents were later admitted at trial. Id. The defendant challenged the search of his briefcase as violative of his Fourth-Amendment rights. Id. at 609-10.

The Eatherton panel noted that the appellant's strongest support for his Fourth-Amendment challenge laid in Chimel v. California, 395 U.S. 752 (1962); however, the panel recognized that Chimel cited with approval to Draper v. United States, 358 U.S. 307 (1959), a case involving a "virtually identical" search to the one at issue in Eatherton. 519 F.2d at 610. The Eatherton panel then cited to a number of cases from our sister circuits that, applying Chimel, upheld similar searches of closed containers carried by the arrestee. 519 F.2d at 610 (citing United

States v. Maynard, 439 F.2d 1086 (9th Cir. 1971); United States v. Mehciz, 437 F.2d 145 (9th Cir. 1971), cert. denied, 402 U.S. 974 (1971); United States ex rel. Muhammad v. Mancusi, 432 F.2d 1046 (2d Cir. 1970), cert. denied, 402 U.S. 911 (1971)). Lastly, the Eatherton panel noted that the Supreme Court's then-recent decisions in United States v. Robinson, 414 U.S. 218 (1973); Gustafson v. Florida, 414 U.S. 260 (1973); and United States v. Edwards, 415 U.S. 800 (1974), offered further guidance on the Fourth-Amendment issue. 519 F.2d at 610.

Relying on this case law, the Eatherton panel determined that differentiating between the cigarette packages in Robinson and Gustafson and the briefcase in Eatherton "requir[ed] gossamer distinctions." Id. at 610. The panel further held that "[w]hile a briefcase may be a different order of container from a cigarette box, it is not easy to rest a principled articulation of the reach of the [F]ourth [A]mendment upon the distinction." Id. Relying on Edwards, the Eatherton panel emphasized that once the briefcase was "properly seized" as "incident to [the defendant's] arrest" any expectation of privacy the defendant held was diminished. Id. at 610-11.

### B. Chadwick

After Eatherton, the Supreme Court decided United States v. Chadwick, 433 U.S. 1 (1977). In Chadwick, the Court examined the search of a 200-pound footlocker stowed in the trunk of the

defendant's car at the time of arrest. 433 U.S. at 3-4. Officers subsequently seized the footlocker, transported it to a federal building, and then, an hour and a half later and without a warrant, searched the footlocker. Id. at 4. The officers had no reason to believe the footlocker held inherently dangerous items or contained evidence that could lose value over time. Id. Examining the nature of the footlocker, the Court noted that "[l]uggage contents are not open to public view . . . nor is luggage subject to regular inspections and official scrutiny on a continuing basis." Id. at 13. "[L]uggage is [also] intended as a repository of personal effects." Id.

Chadwick reiterated that "[t]he potential dangers lurking in all custodial arrests make warrantless searches of items within the 'immediate control' area reasonable without requiring the arresting officer to calculate the probability that weapons or destructible evidence may be involved." 433 U.S. at 14-15. But Chadwick importantly clarified that "warrantless searches of luggage or other property seized at the time of an arrest cannot be justified as incident to that arrest either if the search is remote in time or place from the arrest . . . or no exigency exists." Id. at 15 (cleaned up). Finally, the Chadwick Court concluded that "[o]nce law enforcement officers have reduced luggage or other personal property not immediately associated with the person of the arrestee to their exclusive control, and there

is no longer any danger that the arrestee might gain access to the property to seize a weapon or destroy evidence, a search of that property is no longer an incident of the arrest." Id. Put another way, "when no exigency is shown to support the need for an immediate search, the Warrant Clause places the line at the point where the property to be searched comes under the exclusive dominion of police authority." Id.

### C. Cases Postdating Chadwick

After Chadwick, several of our sister circuits addressed situations involving items that an arrestee was holding or carrying at the time of arrest and questioned the breadth of Chadwick, reaching mixed results. See United States v. Han, 74 F.3d 537, 543 (4th Cir. 1996) (finding that, after Chadwick, "[t]he determinative question appears to be whether the time and distance between elimination of the danger and performance of the search were reasonable" and holding that "when a container is within the immediate control of a suspect at the beginning of an encounter with law enforcement officers; and when the officers search the container at the scene of the arrest; the Fourth Amendment does not prohibit a reasonable delay . . . between the elimination of danger and the search"); see also United States v. Garcia, 605 F.2d 349, 356-57 (7th Cir. 1979) (noting the "less than uniform" application of Chadwick across the circuits).

In *United States* v. *Calandrella*, 605 F.2d 236 (6th Cir. 1979), *cert. denied*, 444 U.S. 991 (1979), the Sixth Circuit examined a briefcase seized from the person at the time of arrest. That court, examining *Chadwick*, noted that "the primary [F]ourth [A]mendment interest [is] in the privacy of the contents of [a container], not in the simple possession of the receptacle." *Id.* at 249. Therefore, the defendant had an increased privacy interest in the briefcase, like the footlocker in *Chadwick*, the "very purpose [for which] is to transport papers and other items of an inherently personal, private nature." *Id.* (internal quotations omitted). Ultimately, the *Calandrella* court found that under *Chadwick*, "once the agents had seized the item and reduced it to their exclusive control there was no further danger that the defendant would secure therefrom either a weapon or an instrumentality of escape, or would destroy evidence contained in the briefcase." *Id.* at 249, 251-52 (expressly overturning its prior line of cases upholding searches of suitcases "even after the item has been seized and the suspect subdued" and citing to courts that had made similar decisions prior to *Chadwick*, including *Eatherton*).

Several other circuits also recognized the applicability of *Chadwick* to cases involving carried containers. *See* *United States* v. *Berry*, 571 F.2d 2, 3 (7th Cir. 1978) (holding that "until *Chadwick*, there was no reason for law enforcement officials to

believe that attache cases were not among those personal effects which, under [Robinson], could be seized as part of a 'full search of the person' incident to a lawful arrest, and which, under [Edwards], could be searched several hours after the suspect had been taken into custody"); see also United States v. Stewart, 595 F.2d 500, 503 (9th Cir. 1979) (finding that if Chadwick was applicable, "it would require suppression of the contents of the attache case"); United States v. Myers, 308 F.3d 251, 273 (3d Cir. 2002) (examining the search of a "school bag" under the immediate control analysis and citing Chadwick's rationale).

## D. **Gant**

Later, in Arizona v. Gant, 556 U.S. 332 (2009), the Court revisited the search-incident-to-arrest exception. The Court once again emphasized that the limitation on that exception "ensures that the scope of a search incident to arrest is commensurate with its purposes of protecting arresting officers and safeguarding any evidence of the offense of arrest that an arrestee might conceal or destroy." Id. at 339. Relying on the principles articulated in Chimel, the Court reiterated that "[i]f there is no possibility that an arrestee could reach into [an] area that law enforcement officers seek to search, both justifications for the search-incident-to-arrest exception are absent and the rule does not apply." Id.

## E. Cases Postdating **Gant**

The decision in **Gant** has been instrumental in the understanding and application of the Fourth Amendment and the search-incident-to-arrest doctrine. After **Gant**, circuit courts applied that precedent and the immediate control analysis to containers outside of the vehicle context. See United States v. Shakir, 616 F.3d 315, 318 (3d Cir. 2010), cert. denied, 562 U.S. 1116 (2010) (examining the search of a gym bag under the "narrowed" scope of the search-incident-to-arrest doctrine under **Gant**); United States v. Cook, 808 F.3d 1195, 1199 (9th Cir. 2015) (applying the immediate control analysis to a backpack); United States v. Davis, 997 F.3d 191, 193 (4th Cir. 2021) (holding that "**Gant** applies beyond the automobile context to the search of a backpack"); United States v. Knapp, 917 F.3d 1161, 1168-70 (10th Cir. 2019) (considering whether the search of an arrestee's purse was justified under **Chimel** and **Gant**); see also United States v. Hill, 818 F.3d 289, 295 (7th Cir. 2016) (applying immediate control analysis to bag); United States v. Matthews, 532 Fed. Appx. 211, 217-19 (3d Cir. 2013) (finding that the search of a backpack could not be justified under the immediate control analysis of the search-incident-to-arrest doctrine); cf. United States v. Perdoma, 621 F.3d 745, 750-51 (8th Cir. 2010), cert. denied, 563 U.S. 992 (2011) (upholding the warrantless search of a "small bag" where "the search of the bag occurred in close proximity to where [the

arrestee] was restrained" and the arrestee had already run from officers once; but holding that a closer application of Gant was not necessary under the circumstances). Many of these cases are instructive as to how Gant must be applied to cases involving carried containers.

In Shakir, the Third Circuit was faced with the warrantless search of a gym bag initially held by an arrestee. 616 F.3d at 316. The defendant there argued that the search of his bag was in violation of his Fourth-Amendment rights because he was already handcuffed at the time of the search and could not have accessed the bag. Id. at 317. In response, the government cited several cases upholding searches conducted while an arrestee was handcuffed. Id. However, the Third Circuit noted that the government relied solely on pre-Gant cases. Id. at 318. The court emphasized "Gant as refocusing [its] attention on a suspect's ability (or inability) to access weapons or destroy evidence at the time a search incident to arrest is conducted." Id. Thus, the Shakir court was "left to consider, under Gant and other relevant precedents, whether [the defendant] retained sufficient potential access to his bag to justify a warrantless search." Id. at 319.

In considering that question, our sister circuit "underst[ood] Gant to stand for the proposition that police cannot search a location or item when there is no reasonable possibility

that the suspect might access it." Id. at 320. In accordance with that principle, it held that "a search is permissible incident to a suspect's arrest when, under all the circumstances, there remains a reasonable possibility that the arrestee could access a weapon or destructible evidence in the container or area being searched." Id. at 321. Applying this legal standard to the facts there, the Third Circuit concluded that the search was justified because there was a "sufficient possibility" that the arrestee could have gained access to the bag. Id. The court found this even though the arrestee was handcuffed because the bag was at his feet, he was in a public area surrounded by approximately twenty bystanders, and there was at least one suspected confederate in the area. Id. at 316, 321.

The Ninth Circuit confronted similar questions in assessing the validity of a warrantless backpack search in Cook. 808 F.3d at 1199-1200. There, the arrestee was wearing a backpack at the time the officers approached him. Id. at 1197. While the arrestee was handcuffed on the ground, but within one to two minutes of his arrest, officers picked up the arrestee's backpack, which was right next to the arrestee, and conducted a twenty- or thirty-second cursory search. Id. The officers then took the arrestee to a more secluded area several blocks away and performed a more thorough search of the backpack. Id. The arrestee only challenged the validity of the first cursory search of his backpack

immediately following his arrest.  Id. at 1198.  Relying on Gant, our sister circuit found that "[t]he brief and limited nature of the [initial] search, its immediacy to the time of arrest, and the location of the backpack ensured that the search was 'commensurate with its purposes of protecting arresting officers and safeguarding any evidence of the offense of arrest that [the arrestee] might conceal or destroy.'"  Id. at 1200 (quoting Gant, 556 U.S. at 339).

In Davis, the Fourth Circuit examined the history of the search-incident-to-arrest exception and how Gant altered its understanding of that exception.  997 F.3d at 195-200.  The Davis court found that Gant's first holding, "that police can 'search a vehicle incident to a recent occupant's arrest only when the arrestee is unsecured and within reaching distance of the passenger compartment at the time of the search'" -- a holding derived from Chimel -- applies outside of the automobile context.  Id. at 197 (quoting Gant, 556 U.S. at 343).

After establishing Gant's applicability outside of the automobile search context, the Fourth Circuit analyzed whether the warrantless search of a backpack was permissible under Gant.  Id. at 198.  In Davis, the arrestee fled from officers while carrying his backpack but ultimately became bogged down in a swamp with knee-high water.  Id.  An officer drew his weapon and ordered the arrestee out of the swamp.  Id.  The arrestee complied and dropped

his backpack on the ground; he then laid down and was handcuffed. Id. Two other officers arrived at the scene, and the officers searched the backpack that was not within the arrestee's reaching distance. Id.

The Fourth Circuit then held that the warrantless search of the backpack was unlawful, reasoning that there was "no doubt that [the arrestee] was secured and not within reaching distance of his backpack when [the officer] unzipped and searched it." Id. At the time of the search, the arrestee was face down and handcuffed, he was outnumbered by officers three to one, and the events had occurred in a residential area with no other people present; the court thus had "no difficulty" in determining that the arrestee was secured. Id. The court also emphasized that the arrestee was not within reaching distance of the backpack at the time of the search. Id.

### F. The Impact of Modern Authority on Eatherton

In examining the above cases carefully, I agree with the majority that we do not have a Supreme Court opinion that is "directly on point contradicting our precedent" in Eatherton. United States v. Wurie, 867 F.3d 28, 34 (1st Cir. 2017). However, I remain convinced that the "less common exception" to the law-of-the-circuit doctrine forecloses our present reliance on Eatherton. The authorities discussed above, "although not directly controlling, offer[] a sound reason for believing that

- 46 -

the [Eatherton] panel would change its collective mind."  Id.  "A Supreme Court opinion need not be directly on point to undermine one of our opinions."  United States v. Holloway, 630 F.3d 252, 258 (1st Cir. 2011).  Further, a decision of the Supreme Court "can extend through its logic beyond the specific facts of its case."  Id. (quoting Los Angeles Cnty. v. Humphries, 562 U.S. 29, 38 (2010)).

Unlike the district court, who must apply our "precedent unless it has unmistakably been cast into disrepute by supervening authority," the exceptions to the law-of-the-circuit doctrine provide us with "modest" flexibility in the application of our own precedents.  Eulitt ex rel. Eulitt v. Me. Dep't of Educ., 386 F.3d 344, 349 (1st Cir. 2004), abrogated on other grounds by Carson as next friend of O.C. v. Makin, 596 U.S. 767 (2022).  The majority decision stresses that the second exception to the law-of-the-circuit doctrine "cannot depend on whether there are sound reasons to conclude that the prior panel got it wrong."  However, the scope of the exception applied here is not based on whether I believe there are sound reasons to conclude that the Eatherton panel was wrong, but rather whether there are sound reasons for believing that the Eatherton panel would have changed its collective mind. And this "sound reason" standard has been reiterated by this court. See e.g., Lewis, 963 F.3d at 23; United States v. López, 890 F.3d 332, 340 (1st Cir. 2018); Wurie, 867 F.3d at 34.

- 47 -

Given that scope, in my view, had the Eatherton panel had the benefit of both Chadwick and Gant, that panel would have changed its collective mind as to its interpretation of the search-incident-to-arrest doctrine. As our sister circuits have concluded, Chadwick and, perhaps even more so, Gant have unquestionably altered our understanding of the search-incident-to-arrest doctrine and "provide a clear and convincing basis" to determine that the Eatherton panel too would have come to a different conclusion on the issue. See Guerrero, 19 F.4th at 552.

Chadwick made a nuanced distinction between the reduced expectation of privacy an arrestee has of their person as compared to possessions within their immediate control at the time of arrest. 433 U.S. at 16 n.10. Further, Chadwick's analysis did not hinge on whether the possession was held by the arrestee or was elsewhere in their vicinity. Instead, Chadwick focused on the nature of containers as "repositor[ies] of personal effects."[7] Id.

_____

[7] Indeed, the Supreme Court seems to agree that the result in Chadwick would not have been different had the arrestee been "drag[ging] [the trunk] behind them." Riley v. California, 573 U.S. 373, 394 (2014) (acknowledging the difference between the trunk in Chadwick -- which could hold a large number of personal items and required a warrant to search -- and "a container the size of [a] cigarette package" at issue in Robinson). In my view, Riley lends support for the very line-drawing about different carried containers that Eatherton believed it was unable to make. The majority appears to suggest that Riley distinguishes between personal property that is difficult to carry, either due to its size or weight, and personal property that is commonly carried,

- 48 -

at 13.  Thus, although the Eatherton panel was understandably influenced by the then-recent cases of Edwards, Robinson, and Gustafson when assessing an arrestee's privacy interests, Chadwick would have provided the additional context that "possessions within an arrestee's immediate control cannot be justified by any reduced expectations of privacy caused by the arrest."  433 U.S. at 16 n.10 (emphasis added).

Given this understanding and Gant's refined framework for "immediate control" searches, the Eatherton panel would have centered its analysis around "immediate control" rather than shoehorning the search of a closed container into being "of the person."  Specifically, I believe this modern authority would have led the Eatherton panel to the conclusion, under Chadwick and Gant, that searches of visible containers held or carried by an arrestee -- like the briefcase in Eatherton -- must be treated as "immediate

_____

such as a briefcase.  See Majority at 30.  I do not think this was the Riley Court's intent.  Riley notes that "[m]ost people cannot lug around every piece of mail they have received for the past several months, every picture they have taken, or every book or article they have read -- nor would they have any reason to attempt to do so."  Id. at 393-94.  But, the Riley Court then states that the only way for a person to carry personal property like that (prior to the existence of cell phones) would be to "drag behind them a trunk of the sort held to require a search warrant in Chadwick."  Id. at 394.  In my view, the Riley Court was differentiating between certain containers that may be receptacles for other personal property and small containers like those the size of a cigarette package, while emphasizing that a container like the trunk in Chadwick would have required a search warrant just as a cell phone would.  Id. at 394.

control" searches. See Knapp, 917 F.3d at 1167 (limiting Robinson searches to "searches of an arrestee's clothing, including containers concealed under or within her clothing" and holding that "visible containers in an arrestee's hand . . . are best considered to be within the area of an arrestee's immediate control").

Further, the parties here have not identified any post-Gant published circuit opinions that adopted the same approach taken in Eatherton. Indeed, we have found the opposite: circuits that once took an Eatherton-like approach to cases involving carried containers now applying the "immediate control" analysis in similar circumstances. Cf. United States v. Lewis, 963 F.3d 16, 24 (1st Cir. 2020) (adhering to the law-of-the-circuit doctrine where three sister circuits retained allegiance to this Circuit's reasoning despite a recent Supreme Court decision); Sanchez v. United States, 740 F.3d 47, 57 (1st Cir. 2014) (finding that just two circuits' decisions contrary to our precedent "hardly paint a picture of a rush to the exit so as to allow us to overrule our own controlling precedent"). In short, the continued application of Eatherton simply "runs counter to the strong modern trend in the caselaw." United States v. Guerrero, 19 F.4th 547, 557 (1st Cir. 2021).

Accordingly, I find "that the gloss added by the Supreme Court" to the search-incident-to-arrest exception requires a

different approach than that taken by the Eatherton panel.  United States v. Rodriguez, 527 F.3d 221, 225 (1st Cir. 2008).  Had the Eatherton panel had the benefit of viewing that case "through the prism of" Chadwick and Gant, I believe that they would have come to a different result.  Id. at 226; see Guerrero, 19 F.4th at 559 ("The bottom line [] is that given the Supreme Court cases in vogue after [our prior decision], we believe [that] panel would (if it had the chance) reverse its view of the . . . issue 180 degrees.").

For these reasons, I would find that Eatherton is no longer the law of the circuit.  Instead, the appropriate rule under Chadwick and Gant is that the searches of visible, closed containers held or carried by an arrestee should be analyzed as "immediate control" searches.

## II. Fourth-Amendment Violation

Because I would hold that Eatherton is no longer the law of the circuit and that the search of the backpack here should be treated as an immediate control search, the next step is to determine whether the search was nonetheless justified under the circumstances presented.  Appropriate factors to be considered in that inquiry are: "(1) whether the arrestee is handcuffed; (2) the relative number of arrestees and officers present; (3) the relative positions of the arrestees, officers, and the place to be searched; . . . (4) the ease or difficulty with which the arrestee could gain access to the searched area"; and (5) "the degree to which

arresting officers have separated an article from an arrestee at the time of the search."  Knapp, 917 F.3d at 1168-69.

The district court made the necessary factual findings to support a conclusion that the search of Perez's backpack was violative of his Fourth-Amendment rights.  The district court found that "Perez was secured in handcuffs on the ground under [one officer's] supervision as [another officer] was searching the backpack on the hood or roof of [one of the officer's] vehicle, not within reaching distance of Perez, so destruction of evidence or access to weapons was not at stake."[8]  Accordingly, I would find that under the immediate control analysis, the search of Perez's backpack was in contravention with the warrant requirement of the Fourth Amendment and did not fall within the search-incident-to-arrest exception.

### III. Good Faith

Finding that the search of Perez's backpack violated the Fourth Amendment, however, is not the end of the inquiry.  The

---

[8] The government has argued before us that the backpack was near Perez at the time of the search and that "there was a reasonable possibility that he could access the bag," and the search was therefore justified under the immediate control analysis.  However, it has not pointed us to any support to find that the district court's determinations regarding Perez's inability to reach the backpack at the time of the search were clearly erroneous.  See United States v. Oquendo-Rivas, 750 F.3d 12, 16 (1st Cir. 2014) ("We assess questions of fact . . . for clear error.").  I also do not surmise any support in the record to find a clear error in the district court's factual findings.

Fourth Amendment "says nothing about suppressing evidence obtained in violation of [its] command." Davis v. United States, 564 U.S. 229, 236 (2011). I must thus determine if the exclusionary rule is applicable here. "The rule's sole purpose . . . is to deter future Fourth[-]Amendment violations" and not to redress prior violations. Id. at 236-37. "Our cases have thus limited the rule's operation to situations in which this purpose is 'thought most efficaciously served.'" Id. at 237 (quoting United States v. Calandra, 414 U.S. 338, 348 (1974)).

"When the police exhibit 'deliberate,' 'reckless,' or 'grossly negligent' disregard for Fourth[-]Amendment rights, the deterrent value of exclusion is strong and tends to outweigh the resulting costs." Id. at 238 (quoting Herring v. United States, 555 U.S. 135, 144 (2009)). On the other hand, "when the police act with an objectively reasonable good-faith belief that their conduct is lawful . . . or when their conduct involves only simple, isolated negligence[,] . . . the deterrence rationale loses much of its force, and exclusion cannot pay its way." Id. (internal quotations omitted). "The government bears the burden of showing that its officers acted with objective good faith." United States v. Sheehan, 70 F.4th 36, 51 (1st Cir. 2023) (quoting United States v. Brunette, 256 F.3d 14, 17 (1st Cir. 2001)).

The good-faith exception may be triggered "when the police conduct a search in objectively reasonable reliance on

- 53 -

binding judicial precedent." Davis, 564 U.S. at 239. But importantly, this "exception is available only where the police rely on precedent that is clear and well-settled." United States v. Sparks, 711 F.3d 58, 64 (1st Cir. 2013) (cleaned up). "[W]here judicial precedent does not clearly authorize a particular practice, suppression has deterrent value because it creates an 'incentive to err on the side of constitutional behavior.'" United States v. Bain, 874 F.3d 1, 20 (1st Cir. 2017) (quoting Sparks, 711 F.3d at 64).

Had this case fallen within the first exception to the law-of-the-circuit doctrine -- where "the holding of a previous panel is contradicted by subsequent controlling authority" -- the good-faith exception would plainly not apply. See Barbosa, 896 F.3d at 74. For example, imagine a scenario where, post-Gant, officers searched a vehicle incident to a recent occupant's arrest after the occupant was secured and not within reaching distance of the passenger compartment and without probable cause that the vehicle contained evidence of the offense of arrest. Regardless of whether prior circuit law allowed this practice, that search would be unlawful post-Gant, and the officers could not rely on good faith.

Admittedly, when the second exception to the law-of-the-circuit doctrine applies, as I believe it does here, there is a much closer question as to whether the good-faith

exception applies. Ultimately, given the deterrent value of enforcing a regime where officers err on the side of constitutional conduct in the face of unclear or eroded precedent, I would not permit good faith to bar exclusion in this case.

First and foremost, for the same reasons that I find the second exception to the law-of-the-circuit doctrine applies here, I am of the view that Eatherton was not the kind of "clear and well-settled" precedent that officers could reasonably rely on. See Sparks, 711 F.3d at 64. At the very minimum, Gant -- a landmark case in our Fourth-Amendment jurisprudence -- called into question the continued vitality of Eatherton. It would be untenable to require that Supreme Court holdings address virtually identical factual scenarios before we consider our circuit precedent undermined and reject application of the good-faith exception. Such a requirement would be contrary to the requirement that the precedent officers rely upon "be unequivocal" when shielding unlawfully obtained evidence from exclusion. Sparks, 711 F.3d at 64.

Second, this conclusion aptly aligns with the very purpose of the exclusionary rule: to deter future Fourth-Amendment violations. Davis, 564 U.S. at 236-37. If we do not strip precedent that falls within the second exception to the law-of-the-circuit doctrine of its weight as forcefully as we do in cases under the first exception, officers would be encouraged

to adhere to shaky precedent (no matter how potentially abrogated) until those cases are formally and explicitly overruled.  Because suppression is intended to create the "incentive to err on the side of constitutional behavior," I think the appropriate conclusion is that when opinions authored by the Supreme Court, particularly landmark cases like Gant, call into question our prior precedent, officers must conform their conduct to the more protective reading of the Fourth Amendment laid out by the Supreme Court.  See Bain, 874 F.3d at 20 (quoting Sparks, 711 F.3d at 64).

Finally, this is not a case where "the police engage[d] in conduct that complie[d] with existing precedent, and the law later change[d]."  United States v. Baez, 744 F.3d 30, 33 (1st Cir. 2014).  Gant was decided a decade before the search at issue here occurred, and Chadwick's guidance on closed containers has been binding precedent for over forty years.  Cf. Sparks, 711 F.3d at 67 (finding good faith applied where the applicable Supreme Court case came out three years after the search at issue occurred); United States v. Moore-Bush, 36 F.4th 320, 359 (1st Cir. 2022) (mem.) (Barron, C.J., concurring) (concurring opinion finding that good faith applied when the applicable Supreme Court decision was published over one year after the search began).  Given my view of the impact of these cases on Eatherton, the officers were required to follow the logic supplied by Gant and Chadwick.

For these reasons, I would conclude that the good-faith exception is not available under the circumstances and suppression is the proper outcome to deter future Fourth-Amendment violations.

**IV. Conclusion**

For the above stated reasons, I would abrogate <u>Eatherton</u> to the extent it is inconsistent with this analysis, reverse the district court's decision on the motion to suppress, vacate the judgment of conviction, and remand for further proceedings consistent with this opinion.